Jeff E. GEESLIN, Appellant,

v.

Amy McELHENNEY, et al., Appellee.

No. 3–89–091–CV.

Court of Appeals of Texas,
Austin.

April 18, 1990.

Nancy E. Green, Hearne, Knolle, Lewallen, Livingston & Holcomb, Austin, for appellant.

C. Dean Davis, Robert C. Pozen, Davis & Davis, P.C., Austin, for appellee.

Before POWERS, GAMMAGE and JONES, JJ.

POWERS, Justice.

Jeff E. Geeslin appeals from a probate-court order that removes him from his position as independent executor of the will of Thomas R. McElhenney, deceased. We will affirm the order.

### THE CONTROVERSY

McElhenney died September 15, 1983, survived by his second wife, Sarah Ann McElhenney, his adopted daughter, Jennifer Ann McElhenney, and four children from his previous marriage to Ada McElhenney: Sidney McElhenney, Thomas R. McElhenney, Jr., Amy McElhenney, and John Oakley McElhenney. The will and a codicil devised various property interests to Sarah Ann McElhenney and the four children of the first marriage. The probate court admitted the will to probate and in

November 1983 issued letters testamentary to Geeslin.

In June 1988, the four children of the first marriage moved the probate court to remove Geeslin from his position as independent executor and to prohibit payment of any commissions to him. They alleged as grounds several acts and omissions they characterized as "gross mismanagement" or "gross misconduct." These referred to Geeslin's omissions regarding estate and inheritance taxes, his commingling of estate funds with those of a pension plan of which he was administrator, and certain other actions and inactions on Geeslin's part.

After notice and an evidentiary hearing, the probate court found Geeslin's omissions regarding the estate-tax liability amounted to "gross mismanagement" or "gross misconduct," as did his commingling of the funds mentioned above. In addition, the probate court found that eleven other acts or omissions amounted in the aggregate to "gross mismanagement" or "gross misconduct." On those determinations, the probate court rested its order removing Geeslin from the position of independent executor. Geeslin appeals, contending the order amounted to an abuse of discretion.

## "GROSS MISMANAGEMENT" AND "GROSS MISCONDUCT"

■ The trial court was empowered to remove Geeslin "on its own motion or on motion of any interested person" provided Geeslin was "proved to have been guilty of gross misconduct or gross mismanagement in the performance of his duties." Tex. Prob.Code Ann. § 149C (Supp.1990). Geeslin's points of error in this Court, attacking the sufficiency of the evidence, turn primarily on the characterization of his acts and omissions as "gross misconduct or gross mismanagement in the performance of his duties." We must therefore assign meaning to the quoted expressions before we may appraise the sufficiency of the evidence to determine if Geeslin's acts or omissions could properly be so characterized under the evidence.

Section 149C, patterned after an analogous section of the Uniform Probate Code, was added to the Texas Probate Code in 1979. It resulted from the Legislature's decision that even *independent* executors should be subject to removal by a court for "gross mismanagement" or "gross misconduct," notwithstanding the fact that the existence of the statutory remedy might defeat to some extent the purposes of independent administration as a speedier and less costly alternative to court-supervised administration. *See Bell v. Still,* 403 S.W.2d 353 (Tex.1966); Marshall, *Independent Administration of Decedents' Estates,* 33 Texas L.Rev. 95 (1954); Comment, *Fiduciary Administration—Administration of Estates,* 45 Texas L.Rev. 352 (1966); Grant & Whitehill, *Texas Probate Code,* 43 Tex.B.J. 893 (1980).

In all events, one may not reasonably impute to the Legislature an intent that the terms "gross mismanagement" or "gross misconduct" should encompass any and all deviations from ordinary care. That idea is negated by the adjective "gross." More importantly, including negligent acts and omissions would practically convert independent administration into court-supervised administration, for it would encourage numerous lawsuits challenging almost every aspect of an executor's conduct regarding the estate. That intention may not be imputed to the Legislature because it left intact the provisions for independent administration.

While the foregoing ideas narrow the scope of conduct that might be characterized as "gross mismanagement" or "gross misconduct," another proposition works to expand it. Implicit in the word "duties," as it is used in section 149C, is the concept of "trust." The "duties" of an independent executor are those of a trustee. He holds property interests, not his own, for the benefit of others. He manages those interests under an equitable obligation to act for the others' benefit and not his own. He is a "fiduciary" of whom the law requires an unusually high standard of ethical or moral conduct in reference to the beneficiaries and their interests. His "duties" are more than the ordinary "duties" of the

marketplace. They connote fair dealing, good faith, fidelity, and integrity. He may have *additional* duties that he would not have in an ordinary business relation—a duty of full disclosure, for example, and a duty not to use the fiduciary relationship for personal benefit except with the full knowledge and consent of the beneficiaries. *Cartwright v. Minton,* 318 S.W.2d 449, 453 (Tex.1958); *Chien v. Chien,* 759 S.W.2d 484, 494 n. 6 (Tex.App.1988, no writ). "It is against public policy to allow persons occupying fiduciary relations to be placed in positions in which there will be constant danger of a betrayal of trust by the vigorous operation of selfish motives." 36A C.J.S. *Fiduciary,* at 388 (1961).

Thus, the statutory criteria ("gross mismanagement" and "gross misconduct") are necessarily elastic. They must be sufficiently narrow to exclude ordinary negligence, yet sufficiently broad to include a fiduciary's breach of his higher and additional duties, some of which might not even exist absent the fiduciary relationship.

In applying to the present record the statutory criteria of "gross mismanagement" and "gross misconduct," we believe it unnecessary to attempt to define them for any and all cases or circumstances. It is sufficient, we believe, to state our view that they include *at minimum:* (1) any *willful* omission to perform a legal duty; (2) any *intentional* commission of a wrongful act; and (3) any breach of a *fiduciary* duty that results in actual harm to a beneficiary's interest. This definition is sufficient for the present case.

### "ABUSE OF DISCRETION"

■ We may conclude the probate court "abused its discretion" only if the record demonstrates the court's order was: (1) based on a legally irrelevant factor; (2) issued without consideration of a legally relevant factor; or (3) entirely unreasonable in light of all the legally relevant factors. *Landon v. Budinger, Inc.,* 724 S.W.2d 931, 938 (Tex.App.1987, no writ).

In the present case, we believe the relevant factors to be these: (1) the higher quality of ethical and moral conduct implic-

it in Geeslin's fiduciary status; (2) the degree of harm sustained by the beneficiaries' interest, owing to Geeslin's conduct; (3) the public policy in favor of independent administration, due to the salutary purposes served by that method of administration; (4) the sufficiency of a bond to protect the beneficiaries' interest if a bond is given under section 149 of the Probate Code; (5) the complexity of the estate; (6) whether Geeslin's acts and omissions resulted from professional advice, or whether they occurred in the face of such advice; and (7) the distinction between willful conduct and inadvertent acts and omissions generally. We will consider the trial court's order in light of these factors.

### INCURRING AVOIDABLE LOSSES

■ The evidence shows the estate was required to pay an additional federal estate tax of $285,432.00, owing to a miscalculation by the accountants in computing the marital deduction in the return filed in December 1984. When finally paid in February 1988, the estate incurred related charges of $131,409.07 in interest and a penalty equal to $28,576.22.

Concerning the foregoing sums, the trial court found that each of the following amounted to gross mismanagement or misconduct on Geeslin's part: (1) he failed from the outset "to assess the income of the estate and its taxes and other obligations"; (2) he failed "to conserve and set aside funds, or sell property, when he became aware that there would be" an additional estate-tax liability; (3) he paid beneficiaries from estate funds "without conserving and setting aside funds to pay the federal-estate tax and other obligations"; (4) he failed "to stop distributing funds to beneficiaries and paying Executor's commissions when he became aware that tax deficiencies would be due"; and (5) he failed to make a timely request for an extension of time within which to pay the federal estate tax.

These findings refer to evidence showing that Geeslin knew of the additional tax liability as early as April 1985. He did not limit the estate's liability for interest and

the penalty because, he testified, the estate never had, until February 1988, the cash necessary to pay the additional tax interest and penalty. In that month and year, the estate derived $750,000.00 in cash from the sale of a parcel of real property. From those proceeds, Geeslin paid the additional tax ($285,432.00), interest ($131,409.07), and a penalty ($28,576.22).

We believe the trial court could reasonably have rejected Geeslin's explanation from other testimony he gave. He testified that in January 1986, he sold another parcel of real property from which the estate received cash proceeds of $473,997.59. In that month, if our extrapolations are correct, the combined additional tax ($285,432.00) and interest (about $90,326.87) totalled $375,758.87, and the penalty had not yet been incurred. In lieu of paying the $375,758.87 or any part of it, Geeslin elected to distribute the $473,997.59 proceeds to himself as commissions ($50,000.00), to the beneficiaries ($316,967.57), and in payment of other estate obligations. One observes that the sums paid the beneficiaries approximately equaled the combined tax and interest obligations due in January 1986.

In May 1987, Geeslin received from the federal authorities a "final notice" demanding payment of the additional estate tax and accrued interest, stating that a reply within 10 days was required in order to avoid enforcement of the estate-tax lien and additional penalties. Geeslin failed to make reply. He testified he did not notify the beneficiaries or their attorneys. In June 1987, he did request an extension of time within which to pay the estate-tax obligations. It was refused because it was not filed within the required 10–day period, and a penalty of $28,476.22 was assessed.

Corollary obligations were incurred in the period in connection with the State inheritance-tax obligation, resulting ultimately in a penalty of $5,691.40 and additional interest expense.

Geeslin testified that he relied for preparation of the estate-tax return on a firm of reputable accountants he had engaged. Thus, we believe the initial miscalculation might not be imputed to his conduct.

When he learned of the additional tax in April 1985, however, we believe the trial court might reasonably have concluded from the evidence, after considering all the relevant factors, that Geeslin's conduct thereafter, in relation to the estate-tax obligations, amounted to gross misconduct and mismanagement. While we are not apprised of the trial court's reasoning, owing to the absence of findings of underlying fact, the evidence would support a rationale that Geeslin could have avoided the $28,476.22 penalty altogether by a timely request for an extension, or he might have paid a part, at least, of the estate-tax obligations to reduce the steadily accruing interest. Instead, he failed to request an extension, in the face of a warning that a penalty would be incurred, and he elected to distribute the entire $473,997.59 for the purposes indicated above. We need not discuss the possibilities of the estate's obtaining cash from loans secured by its real property.

## COMMINGLING AND DIVERSION OF ESTATE FUNDS

 In connection with his medical practice, Thomas R. McElhenney, the decedent, instituted a pension plan administered by Geeslin. The primary beneficiary of the plan was Sarah Ann McElhenney, McElhenney's surviving widow. In early 1984, the pension plan was terminated on Geeslin's initiative.

Concerning the pension plan, the trial court determined that the following amounted to gross mismanagement or misconduct on Geeslin's part: he commingled the funds of the estate and those of the pension plan; he used estate funds to pay pension-plan liabilities, and *vice versa;* and he "used the funds of the Estate to make terminating distributions to" pension-plan participants. We shall summarize briefly the evidence to which these determinations refer.

The pension-plan assets consisted of cash, securities, and a lot encumbered by a mortgage. The plan did not have a checking account. In the course of his service as executor of the estate, Geeslin paid from

the estate a total of $130,000.00 in monthly mortgage payments on the pension-plan lot, treating these, he testified, as a "widow's draw." This refers, evidently, to the fact that Sarah Ann McElhenney was the surviving widow and the primary beneficiary under the pension plan. Geeslin's accountant testified, however, that the advance-draw ledger for the estate did *not* reflect the $130,000.00 paid for Sarah Ann McElhenney's benefit.

The termination of the pension plan in early 1984 necessitated the payments mentioned in the preceding paragraph. Geeslin testified that in 1988 he took $50,000.00 held for the pension plan by a securities-brokerage firm and placed it in the estate's checking account. When the plan was terminated in 1984, nine participants were owed benefits thereunder. Two were paid in full in 1988; the others were entitled to payment, but according to Geeslin's testimony, the plan did not have the $70,000.00 necessary to pay them in full. Geeslin eventually paid them from the proceeds derived from the sale of estate property.

In his testimony, Geeslin stated that his attorneys and accountant advised him that commingling the funds might be prohibited, and that he "obviously went counter to that advice." In fact, the provisions of 26 U.S.C.A. § 4975 (1989) prohibited the lending of moneys or other extensions of credit between a pension plan and one who was a fiduciary with respect to other funds. Geeslin also testified he was unable to pay the plan participants, when required to do so, because he had depleted pension plan assets by paying from them certain estate obligations.

We believe the foregoing, in light of the relevant factors, reasonably justified the trial court's findings of gross mismanagement and misconduct relative to the commingling and diversion of estate funds.

We believe it unnecessary to discuss the other aspects of Geeslin's conduct, in relation to the estate, from which the probate court reached its decision to remove him. It appears to us that the order is quite clear that the same decision would have been made on the basis of the two matters discussed above.

In addition to removing Geeslin from his position as independent executor, the probate court denied him a portion of his commissions, limiting his commissions to 2.5% of the gross estate, or $137,010.77, and requiring him to refund $132,989.23 in commissions previously paid. The court acted within its authority. Tex.Prob.Code Ann. § 241(a)(2) (Supp.1990). The sums in question could reasonably be viewed as commensurate with the value of his services as balanced against the harm done to the beneficiaries' interests. We therefore overrule Geeslin's complaints in that connection.

We affirm the order below.

GAMMAGE, J., not participating.