02-11-107-CV_REH









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00107-CV

 

 


 
 
 In the Matter of the
 Guardianship of
 Cecilia T. Covington,
 An Incapacitated Person
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
  
 
 
  
 
 
  
 
 


----------

 

FROM Probate
Court No. 2 OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1] ON
REHEARING

----------

 

We
have considered appellants Franklin E. Covington III’s (Frank) and Lucila
Covington’s (Chila) motion for rehearing and motion for reconsideration en banc. 
We deny both the motions but withdraw our February 9, 2012 opinion and
substitute the following.

          In
one issue, the Covingtons appeal the trial court’s order denying their
application for reinstatement as guardians of their incapacitated daughter,
Cecilia T. Covington (Ceci).  We affirm the trial court’s judgment.

Background
Facts

          Ceci
is a forty-year-old woman with Down Syndrome.  Her parents, the Covingtons,
sought and were granted guardianship of Ceci in 2003.  In 2006, Ceci moved into
a group home for disabled adults known as Sonnet.  Sonnet is run by Champion Services.

In
2008, Champion employees became concerned that Ceci’s mental health was
deteriorating.  Ceci complained of headaches during the night and would often
stay awake screaming.  Champion staff notified the Covingtons that Ceci was
having problems such as “flat affect, not smiling, [and] aggression.”  In early
2009, Ceci began hiding screwdrivers in her room and laying marbles from a
Chinese checkers game in a line at the bottom of the door to her room.  One
day, Ceci hit another group home resident because he was sitting in a van where
Ceci wanted to sit.  Ceci had imaginary friends that she spoke to, and Champion
staff believed she was spending more and more time talking to them.

Worried
that Ceci’s behaviors were increasing in frequency and severity, Champion began
requesting that the Covingtons consent to have Ceci evaluated by a
psychiatrist.  The Covingtons refused, believing that there was a “physical”
source for Ceci’s pain.  Champion also discussed the screwdrivers and marbles
with the Covingtons, who did not feel that they were a concern.  The Covingtons
told Champion that Ceci’s “booby-traps” were “only showing her frustration
level at being bothered constantly” by Champion staff.

          A
meeting with Champion staff and the Covingtons was held on June 24, 2009. 
Champion employees gave the Covingtons an agenda for the meeting, listing their
concerns about Ceci’s health.  The first topic listed was a request that the
Covingtons consent to a psychiatric evaluation for Ceci.  The Covingtons
responded in a follow-up email, “Psychiatric evaluation will not be performed
at this time.”  The second topic involved administration of medicines.  One of
the requests was that “[f]amilies cannot bring [over-the-counter] medications
and supplements or pharmaceuticals into the [group home] without written
doctor’s orders.”  The Covingtons disagreed that they could not bring
supplements into the home.  Another request was that “[t]he nurse must be
notified before administering any [over-the-counter] medicines and supplements.” 
The Covingtons responded, “Guardians disagree, will not comply.”

          In
July 2009, the trial court appointed a guardian ad litem for Ceci without
notice to the Covingtons.  The guardian ad litem then moved to have the
Covingtons removed as Ceci’s guardians without notice to them, claiming that
they cruelly treated Ceci and neglected to maintain her as liberally as her
means permitted.  See Tex. Prob. Code Ann. § 761 (West Supp. 2011)
(listing the grounds for which a guardian may be removed).  Specifically, the
guardian ad litem alleged that

1.  The Ward herein
evidences frequent and repeated aggressive emotional outbursts, and has been
repeatedly observed talking to “imaginary” people.  The recommendation of Group
Home Staff was that the Ward receive a complete psychiatric evaluation.  The
Guardians both refused, without any expressed reason or valid justification. 
It appears that the Ward might benefit from such evaluation in better
understanding whatever may truly be causing these behaviors.

 

2.  The Ward has
returned to the Group Home from several home visits with the Guardians and has
repeatedly brought screwdrivers, as weapons, because of an imagined fear that
someone is taking her belongings.  When advised of this unacceptable behavior,
the Guardians re-affirmed that they did not see any risk in this behavior [and]
would continue to supply the Ward with such weapons.

 

3.  Medication was
prescribed for the Ward, namely [Z]oloft, and the Guardians discontinued and
refused to allow the Ward to receive the prescribed medication, against medical
advice, and without explanation or justification.

 

4.  Guardians
continue to self-diagnose the Ward’s medical problems as “headaches” and
continue to seek therapy and diagnosis to validate their own assessment, without
any valid medical basis, and in contravention of the recommended course of
evaluation and recommended medical treatment.  As a result, the Ward continues
to suffer and place others at risk with her increasingly violent outbursts.

 

5.  The Guardians, in
their own letter, stated that they refused to comply with the request that
‘Nurse must be notified before administering [over-the-counter] medications and
supplement[s]”  Response “Guardians disagree, will not comply[.]”[] Further,
the staff recommendation that “Families cannot bring supplements[,]”[] response
“Guardians disagree[.]”[] The actions of the Guardians ignore the substantial
side effects of many [over-the-counter] drugs and dietary supplements, some of
which are so severe that the FDA has had to seek legislative intervention to
stop distribution.  Yet, the Guardians insist that they would be able to make
those decisions without even communicating with the staff nurse.

After
a hearing and without notice to the Covingtons, the trial court found that the
Covingtons cruelly treated Ceci and neglected to maintain her as liberally as
her means permit.  The trial court also found that the Covingtons “have both
been proven to be guilty of gross misconduct and gross mismanagement in the
performance of their duties as Guardian” and ordered their removal without
notice.  It appointed Guardianship Services, Inc. as Ceci’s new guardian.

          The
Covingtons then filed an application for reinstatement as guardians.  After a
hearing, the trial court found that the Covingtons failed to demonstrate by a
preponderance of the evidence that they did not engage in the conduct that led
to their removal and denied their application.  This appealed followed.

Standard
of Review

          In
their motion for rehearing and their motion for reconsideration en banc, the
Covingtons argue that we applied the wrong standard of review.  They argue that
their appeal was a no-evidence challenge.  We first note that their issue on
appeal read,

Did Judge King abuse
his discretion by denying the Covingtons’ application for reinstatement as
guardians of their daughter?  Stated differently does the record reflect by a
preponderance of the evidence that the Covingtons did not engage in the conduct
that was alleged by the [guardian ad litem] for their removal?

The
Covingtons also stated in their brief, “A guardianship determination is
reviewed under an abuse-of-discretion standard.”  See In re Guardianship of
Finley, 220 S.W.3d 608, 612 (Tex. App.—Texarkana 2007, no pet.); Thedford
v. White, 37 S.W.3d 494, 496 (Tex. App.—Tyler 2000, no pet.).

We
do note that neither of the two cases that the Covingtons cite (Finley
and Thedford), although they are the only two cases that we have found
referencing the reinstatement statute, see Tex. Prob. Code Ann. § 762
(West Supp. 2011), actually review the plaintiff’s reinstatement claim under
section 762.  However, we believe the abuse of discretion standard applies here.
 The trial court’s determination of reinstatement rests on whether it is satisfied
by a preponderance of the evidence that the applicant did not engage in the
conduct that directly led to the applicant’s removal.  See Act of May
30, 1993, 73rd Leg., R.S., ch. 957, § 1, 1993 Tex. Gen. Laws 4081, 4123
(amended 2011) (current version at Tex. Prob. Code Ann. § 762 (West Supp.
2011)).

          The
Covingtons argued in their brief on appeal that there was no evidence to
support some of the trial court’s findings, which we construed as a challenge
to the legal sufficiency of the evidence.[2]  See Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert.
denied, 526 U.S. 1040 (1999) (noting that a legal sufficiency challenge is
an argument that (1) the record discloses a complete absence of evidence of a
vital fact; (2) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact; (3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (4) the
evidence establishes conclusively the opposite of a vital fact); Robert W. Calvert,
“No Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L.
Rev. 361, 361–62 (1960) (“The controlling consideration with an appellate court
in passing on a point of error directed at the state of the evidence is not
whether the point uses the preferable, or even the proper, terminology, but is
whether the point is based upon and related to a particular procedural step in
the trial and appellate process and is a proper predicate for the relief
sought.”).  The abuse of discretion standard includes the legal and factually
sufficiency of the evidence as “relevant factors in assessing whether the trial
court abused its discretion.”  Brooks v. Brooks, 257
S.W.3d 418, 425 (Tex. App.—Fort Worth 2008, pet denied).  Thus, a trial court
abuses its discretion when there is no evidence to support its ruling.  D.N.S.
v. Schattman, 937 S.W.2d 151, 155 (Tex. App.—Fort Worth 1997, no writ)
(citing Loftin v. Martin, 776 S.W.2d 145, 148 (Tex.1989)).  For
these reasons, we disagree with the Covingtons’ premise that we applied the
wrong standard of review.[3]

          To
determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.  Low
v. Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire v. Cummings,
134 S.W.3d 835, 838–39 (Tex. 2004).  An appellate court cannot conclude that a
trial court abused its discretion merely because the appellate court would have
ruled differently in the same circumstances.  E.I. du Pont de Nemours &
Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); see also Low, 221
S.W.3d at 620.  An abuse of discretion does not occur when the trial court
bases its decisions on conflicting evidence and some evidence of substantive
and probative character supports its decision.  Unifund CCR Partners v.
Villa, 299 S.W.3d 92, 97 (Tex. 2009); Butnaru v. Ford Motor Co., 84
S.W.3d 198, 211 (Tex. 2002).

Discussion

          The
Covingtons did not appeal the order removing them as guardians.  Instead, they
sought reinstatement under section 762 of the probate code.  Section 762, as it
read in 2009, stated,

(a)   Not later than
the 10th day after the date the court signs the order of removal, a personal
representative who is removed under Subsection (a)(6) or (7), Section 761, of
this code may file an application with the court for a hearing to determine
whether the personal representative should be reinstated.

 

. . . . 

 

(c)   If, at the
conclusion of a hearing under this section, the court is satisfied by a
preponderance of the evidence that the applicant did not engage in the conduct
that directly led to the applicant’s removal, the court shall set aside an
order appointing a successor representative, if any, and shall enter an order
reinstating the applicant as personal representative of the ward or estate.

Act
of May 30, 1993, 73rd Leg., R.S., ch. 957, § 1, 1993 Tex. Gen. Laws 4081, 4123
(amended 2011) (current version at Tex. Prob. Code Ann. § 762 (West Supp. 2011)).[4] 
According to the plain language of the statute, the only issue in a
reinstatement hearing is whether the former guardians “did not engage in the
conduct that directly led to [their] removal.”  Tex. Prob. Code Ann. § 762(c). 
Thus, because the Covingtons proceeded under section 762 instead of an appeal
of their removal, we do not address whether it was error for the trial court to
remove them under section 761(c)(4) without the statutorily required notice, see
id. § 761(c) (requiring personal service of the guardian before removal
under that subsection), or whether clear and convincing evidence was presented
at the removal hearing that they cruelly treated Ceci, see id. § 761(b)
(requiring proof by clear and convincing evidence for removal under subsection
(a)(7)).  The only question before us is whether the trial court abused its
discretion in finding that the Covingtons did not prove by a preponderance of
the evidence that they did not engage in the conduct that directly led to their
removal as Ceci’s guardians.  See id. § 762(c).

The
trial court’s judgment states,

The conduct of the
Applicants alleged and testified to in the removal hearing that directly led to
the removal of the Applicants included:

 

a.  Administration of
over-the-counter medications and supplements to the Ward, and refusing to
provide the Group Home with information regarding the medications and
supplements;

 

b.  Refusal to
control the behavior of the Ward from repeatedly:

 

1.  bringing
screwdrivers to the Ward’s room in the Group Home following visits to the home
of the Applicants, despite repeated requests from the management of the Group
Home to control such behavior;

 

2.  setting “booby
traps” in the Ward’s room in the Group Home, despite clear statements on the
part of the Ward that the intent of the “booby traps” was to “get rid” of a
staff supervisor and despite repeated requests from the management of the Group
Home to control such behavior;

 

c.  Refusing to allow
the Ward to be evaluated psychiatrically.

 

I.   The
evidence presented

          A. Administration
of over-the-counter medications

The
Covingtons’ expert witness, Dr. Susan Blue, testified that she did not find
anything in the records she was given to review that documented that the
Covingtons insisted that they would make decisions regarding over-the-counter
medicines without communicating with Champion nurses or staff.  However, the
Covingtons’ emailed response to the June 24th meeting with Champion stated that
they disagreed with Champion’s policy that the nurse must be notified before
anyone administers over-the-counter medications or supplements and that they
would not comply with the policy.  Ceci’s case manager, James Wallace,
testified that their response was unacceptable and that the group home could
not allow it.

          There
was testimony that Chila asked Champion staff to administer an unnamed
medication to Ceci and when they refused because it had not been approved by
the staff nurse, Chila administered it herself.  There was also testimony that
Chila had taken Ceci to receive some injections at a doctor’s office outside
the home without prior knowledge or approval of the Champion nurse.  Chila then
dropped Ceci off at the group home and told the staff that Ceci would have to
be observed for four hours for side effects.

          Angela
Berry, the lead attendant at Champion, testified that in early 2009, Chila told
her that Ceci had “become immune” to the Tylenol she was receiving, and that
Chila wanted the staff to administer Motrin to Ceci instead.  Berry testified,
“she actually gave me a note that said, do not give Tylenol, and I was supposed
to share that note with my staff; but I had to get that approved through [the
nurse].  I couldn’t just pull the Tylenol and give her Motrin.”

B. Refusal
to control Ceci’s behavior 

 

1.  Screwdrivers

 

Chila
admitted that Champion staff had reported to her that they had found
screwdrivers in Ceci’s room on more than one occasion, and that they had told
her that it was inappropriate for Ceci to have them in her room.  She said that
Ceci “had her own screwdrivers” at the Covingtons’ home.  She acknowledged to
Champion that the screwdrivers Ceci had at the group home came from the Covingtons’
home and that Frank had bought new screwdrivers because the ones at the house
kept disappearing.  Dr. Blue opined that Ceci was not bringing the screwdrivers
for “protection” because Ceci “operat[es] at a third grade level.”

Berry
testified that she personally removed four screwdrivers from Ceci’s room, two
from a jewelry box, one wedged in her closet, and one from behind a dresser. 
She said that when she informed Chila, Chila responded “like it was nothing to
her.”  Berry testified that she was concerned for her safety because Ceci was
“always angry” and had attacked a roommate and a staff member.

Wallace
testified that Champion “asked them to make sure that she didn’t bring
screwdrivers in.  And, you know, they just stated that it wasn’t that big of a
deal and we’re blowing it out of proportion because that’s all she was trying
to do was protect herself.”  At the June 24th meeting, Champion again discussed
the screwdrivers with the Covingtons.  Frank responded by telling Champion that
he had a shotgun in his bedroom and saying, “Who doesn’t want to protect
themselves?”  Chila testified that Frank does not have a shotgun in his bedroom,
but that he was only “making a point.”  Wallace testified that he did not think
the Covingtons’ response was appropriate.

          At
the hearing, Chila continued to deny that Ceci’s possession of screwdrivers
posed a threat to others in the group home.  She was asked,

Q. Right.  So you’ve
got a daughter who is talking to imaginary people, carrying on conversations
with imaginary people, aggressively acted out beating—assaulting somebody in
the front seat of the van because she didn’t want—because she wanted to sit
there, and now she’s got screwdrivers by her bedside.  You don’t see a problem
with that?

 

A.  No, I do not.

 

Q. Okay.

 

A.  I know my
daughter.

 

Q. Do you see why the
group home might be a little concerned about that?

 

A.  I knew what their
agenda was.

 

Q. What their agenda
was?  What was their agenda?

 

A.  A psychiatric
evaluation.

2.  “Booby traps”

Chila
acknowledged at the hearing that Champion had reported to her on more than one
occasion that Ceci was arranging marbles in front of the door to her room at
the group home.  Chila claimed that Ceci only played with the marbles by
putting them in lines.  Champion staff testified that the marbles were not a
game but were specifically arranged “to trap you from opening the door or to
get you.”  Ashley Woodard, a direct care staff at Champion, testified, “[W]hen
I asked her to pick them up she says that it’s a booby-trap and she needs them
there.  And she doesn’t want to move them.”  Berry testified that Ceci would
lay out the marbles very frequently, “too many [times] to count.”  Berry
testified that Ceci would talk to her imaginary friend George and

She would be very
angry and upset and she would be talking to George about maybe plotting, like
she would set booby-traps.  That’s what Ceci would call them, booby-traps.  And
the booby-traps she said was to get rid of myself and Adele, which is another
staff.

 

And
at one point, she was in her room and she was telling George that the trap didn’t
work, like, [“]it didn’t work.  We got to try something else and we will try
again tomorrow . . . .[”]

Berry
testified that Ceci told her, “You don’t belong here, you got to go.”  She explained,

She would take
marbles and put them along her room door, like, right under the door, where if
you were to look down, you’re not going to see them until you open the door;
and when we opened the door, we would see them there.  And I notified her
mother of it and she told me, well, the staff should be smart enough to look
down on the ground or to just stay out of her room.

Wallace
also testified that Ceci took “beads” and laid them in front of her door.  He
stated,

And when one of the
staff approached her door that—that she told them to come in and they saw the
beads and they asked what they were for.  And, I believe, she stated that come
on in; you’ll see.  And then it was later discussed that she—she had them there
so that the staff would trip and fall.

Dr.
Blue testified that it would be a cause for concern if Ceci was setting booby
traps, but in her opinion, Ceci did not have the mental capacity to create a
booby trap.  Dr. Blue testified that the notes she read from Champion stated
that the staff laughed about the marbles.

Berry
testified that she started to become concerned that Ceci was hiding
screwdrivers and setting booby traps and “constantly planning to get rid” of
staff members.  Berry had all the knives in the group home locked up so that
Ceci would not be able to access them.  She explained that because the marbles
came from a game, staff members were not allowed to take them from Ceci because
she was allowed under her service program to have games.

          Wallace
testified that when the marbles were reported to the Covingtons, they did not
think it was a serious concern.  Denise Gasmire, the general manager and owner
of Champion, also testified that the Covingtons were informed of the booby
traps but that they “kind of laughed it off.”  The Covingtons told Champion
that Ceci’s “booby-traps” were “only showing her frustration level at being
bothered constantly” by Champion staff.

C. Refusing
to allow Ceci to be evaluated psychiatrically

Gasmire
testified that Ceci’s behaviors were “getting very severe.”  She said,

She would just be
physically agitated, some yelling involved with that, just a lot of anger.

 

We
also documented some physical agitation when she would start saying, something
is poking me.  And then, self—like, injurious behavior, she would hit herself a
lot in these episodes and then she would talk to imaginary friends.  And I
believe those were the four things that we specifically documented because they
happened in clusters and one generally leads to the other, especially when she’d
really get ramped up; so we were tracking those four behaviors specifically.

Berry
testified that in the months prior to the Covingtons’ removal, Ceci was talking
to her imaginary friends more and more frequently.  She also testified that
Ceci was more frequently getting angry at her roommates and staff members. 
Wallace also testified that Ceci was acting out more and more frequently.  Gasmire
testified that Ceci was unhappy and “suffering.”

Chila
testified that in the three months leading to her removal, she noticed that
Ceci was “in a lot of pain.”  She said that Ceci was “very consistent in having
headaches at night.  We called them headaches because we didn’t [k]now how to
describe them, or she didn’t know how to describe them; but she was in extreme
pain.”  Chila also admitted that Champion staff asked her and Frank “multiple
times” on “multiple occasions” to get Ceci a psychiatric evaluation, but that
she had never taken Ceci to a psychiatrist while she was her guardian.

The
Covingtons did take Ceci to an allergist, an acupuncturist, a neurologist, a
chiropractor, and had sinus surgery and sleep apnea treatments performed.  None
of those alleviated Ceci’s episodes.  The neurologist’s only recommendation was
that Ceci “use a special hypoallergenic pillow.”  The Covingtons did take Ceci
to a neuropsychologist, Dr. Bengston, but Champion staff told the Covingtons in
the June 24th meeting that Dr. Bengston’s report “did not address any concerns
or questions as to what may be the cause of the behaviors, or how to address
the behaviors.”  The Covingtons “reported [that] the behaviors are due to the
extreme pain and are mostly her coping mechanisms,” and stated that the pain
and resulting behaviors could be reduced by putting ice on Ceci’s head, as
recommended to them by the chiropractor.  Chila told Champion that her neighbor
had told her that if Ceci was evaluated by a psychiatrist, he will put her on
medication.  Chila admitted that Champion was only asking for an evaluation,
not that Ceci be put on medication, but that she was refusing on the assumption
that Ceci would be medicated anyway.

Two
Champion employees at the meeting testified that the Covingtons’ stated reason
for refusing an evaluation was the fear that the psychiatrist would prescribe
psychotropic medications.  Chila testified that Champion asked the Covingtons
at least ten times in the meeting to agree to a psychiatric evaluation.  At the
hearing, she was asked,

Q.      Did you agree
to do the psychiatric evaluation?

 

A.  No.

 

Q. All right.

 

A.  Not at that time.

The Covingtons
told Champion that they did not want Ceci on medication until they found “the
cause of their daughter’s headaches and pain.”  They stated that they did not
“recognize” Ceci’s behaviors as “behavioral concerns but expressions of extreme
pain and discomfort.”  They wrote in their annual report to the probate court,
“Cecilia’s overall behaviors were to us, her parents/guardians, directly
related to her sleep deprivation.  [Champion] does not see this.  They have
been pushing for a neuropsychiatric and psychological evaluation since February
[2008].”  They also told the probate court that they believed that Ceci was
actually improving.  The Covingtons’ expert witness, Dr. Blue, opined that the
Covingtons did not inappropriately refuse a psychiatric evaluation.  She
testified that the Covingtons’ concern that the psychiatrist would prescribe
medication was a valid concern.

II.  Sufficiency
of the evidence

The
Covingtons did not prove by a preponderance of the evidence that they did not
engage in the conduct that directly led to their removal as Ceci’s guardians.  See
Tex. Prob. Code Ann. § 762(c).  The preponderance of the evidence
showed that the Covingtons refused to submit to a psychiatric evaluation on the
assumption that Ceci would be medicated.  The evidence also showed that
Champion was seeking only an evaluation and not necessarily psychotropic
medication; thus, the Covingtons’ justification was not valid.  The Covingtons
also admitted to telling Champion that they refused to abide by Champion’s
policy of notifying the nurse before giving Ceci any over-the-counter
medication or supplements.

The
evidence also showed that the Covingtons did not express any concern over
Ceci’s possession of screwdrivers in the group home or her setting “booby
traps” with marbles in front of her door.  There was no evidence that the
Covingtons expressed any plan to limit Ceci’s access to screwdrivers at their
house or that they would cease buying screwdrivers to replace the ones Ceci
took.  The Covingtons maintained at trial that Ceci was not a threat to her
roommates or Champion staff, despite acknowledging that Ceci would act out
physically when she was upset or angry.  Although the Covingtons’ expert
testified that because Ceci “operat[es] at a third grade level,” she did not
have the mental capacity to set the traps maliciously, the preponderance of the
evidence was that Ceci was laying out the marbles “so that the staff would trip
and fall.”

In
their motion for rehearing and their motion for reconsideration en banc, the
Covingtons argue that our review of the evidence did not consider the evidence
in its “proper context.”  They contend that the word “conduct” as used in the
reinstatement statute equates to the grounds for removal under section 761.  See
Tex. Prob. Code Ann. § 761; Act of May 30, 1993, 73rd Leg., R.S., ch. 957, § 1,
1993 Tex. Gen. Laws 4081, 4123 (amended 2011) (current version at Tex. Prob.
Code Ann. § 762 (West Supp. 2011)).  In essence, they claim that we should
review their behavior and determine whether those acts rise to the level of
cruel treatment or gross misconduct and gross mismanagement in the performance
of their duties as guardians.  This amounts to a review of whether the guardian
ad litem presented sufficient evidence to demonstrate that the Covingtons’
conduct amounted to cruel treatment or gross misconduct at the hearing for
removal.  As we noted above, the Covingtons did not appeal their removal,
although a direct appeal of their removal was available.  See, e.g.,
In re Keller, 233 S.W.3d 454 (Tex. App.—Waco 2007, pet. denied) (appeal
from a removal); Finley, 220 S.W.3d at 608 (same).  Thus, we cannot
review the trial court’s judgment in the removal proceedings to remove the
Covingtons.[5]

          Even
construing the word “conduct” in section 762 as the grounds listed in section 761,
as the Covingtons would have us do, we cannot say that the trial court abused
its discretion in finding that the Covingtons engaged in cruel treatment, gross
misconduct, or gross mismanagement.  Under the definition that the Covingtons
set forth in their brief, cruel treatment includes “willful persistent
infliction of unnecessary suffering, whether in realization or apprehension,
whether of mind or body.”  Goodfellow v. Goodfellow, No. 03-01-00633-CV,
2002 WL 31769028, at *3 (Tex. App.—Austin, Dec. 12, 2002, no pet.) (not
designated for publication).  Gross misconduct or mismanagement includes “at
minimum: (1) any willful omission to perform a legal duty; (2) any intentional
commission of a wrongful act; and (3) any breach of a fiduciary duty
that results in actual harm to a beneficiary’s interest.”  Finley, 220
S.W.3d at 619 (quoting Geeslin v. McElhenney, 788 S.W.2d 683,
684–85 (Tex. App.—Austin 1990, no writ)).

          The
preponderance of the evidence showed that the Covingtons refused to submit Ceci
to a psychiatric evaluation without valid justification, allowing Ceci’s
extremely painful headaches to continue.  The Covingtons claim in their motion
for rehearing and their motion for reconsideration en banc that they based
their refusal of the evaluation on the advice of Ceci’s treating physicians and
neuropsychologists.  There was no evidence at the reinstatement hearing that
any doctor told the Covingtons that a psychiatric evaluation was unnecessary or
harmful.  Chila only testified that none of the doctors told her to get a
psychiatric evaluation.  In fact, Chila’s testimony was that they refused based
on their neighbor’s claim that Ceci would be medicated.  Champion’s requirement
of notifying the nurse before giving Ceci any over-the-counter medication or
supplements is an important policy implemented to protect Champion residents
from dangerous medication interactions.  The Covingtons expressly refused to
abide by the policy, which could lead to serious physical danger, especially
considering the number of doctors that Ceci sees and the number of medications that
Ceci takes.

As
the Covingtons note, section 762’s purpose is to provide improperly removed
guardians the opportunity to be reinstated by proving that they did not engage
in the conduct that led to their removal.  Under any definition of “conduct,” the
Covingtons failed to meet that burden.  The preponderance of the evidence
demonstrates that the Covingtons engaged in the conduct that directly led to
their removal.  Therefore, we cannot say that the trial court abused its
discretion in denying the Covingtons’ application for reinstatement.  We overrule
the Covingtons’ issue.

Conclusion

          Having
overruled the Covingtons’ sole issue on appeal, we affirm the judgment of the
trial court.

 

 

 

 

LEE GABRIEL
JUSTICE

 

PANEL: 
GARDNER,
MCCOY, and GABRIEL, JJ.

 

DELIVERED:  May 3, 2012









[1]See Tex. R. App. P. 47.4.





[2]In fact, this section of
the Covington’s argument begins, “The Covingtons challenge the legal and
factual sufficiency of the evidence to support the following findings of fact
and the legal sufficiency of the evidence to support the following conclusions
of law:  10a, 10b, 10c, 15, 32, 33, 36, 37, 38, 39, 40, and 41.”  The
Covingtons then attempt to transform this appeal of the trial court’s decision
in the reinstatement hearing to an appeal of the removal itself by arguing that
“[t]he removal of the Covingtons required clear and convincing evidence of
their cruel treatment of Ceci.  See Tex. Prob. Code Ann. § 761(b).” 
Whether the Covingtons were removed based on clear and convincing evidence was
not at issue in the reinstatement hearing, nor is it now an issue before this
court.





[3]To the extent that the
Covingtons’ motion for rehearing and motion for reconsideration en banc can be
construed to request that we review the trial court’s judgment under a
different standard than that requested in their appeal, we cannot address their
new issue.  See Wentworth v. Meyer, 839 S.W.2d 766, 778 (Tex. 1992)
(Cornyn, J., concurring) (“A motion for rehearing does not afford a litigant an
opportunity to raise new issues, especially after the case has been
briefed, argued, and decided on other grounds.”); Morrison v. Chan, 699
S.W.2d 205, 206–07 (Tex. 1985) (holding that court of appeals did not err in
refusing to reverse the case on a point raised for the first time in a motion
for rehearing).





[4]Under the plain language
of the statute, section 762 is only available when a guardian has been removed
under either subsection (6) or (7) of section 761(a).  Tex. Prob. Code Ann. §
762(a).  Subsection (6) allows for the removal of a guardian who “has
misapplied, embezzled, or removed from the state, or is about to misapply,
embezzle, or remove from the state, all or any part of the property committed
to the guardian’s care.”  Id. § 761(a)(6).  Subsection (7) in 2009
allowed for the removal of a guardian who “has neglected or cruelly treated a
ward.”  Act of May 30, 1993, 73rd Leg., R.S., ch. 957, § 1, 1993 Tex. Gen. Laws
4081, 4123 (amended 2011) (current version at Tex. Prob. Code Ann.
§ 761(a)(7) (West Supp. 2011)).  The Covingtons were removed under
subsections (a)(7), (a)(8), and (c)(4).





[5]Even if we could review
the removal, there is no record of the hearing for us to review.