

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00107-CV

IN THE MATTER OF THE
GUARDIANSHIP OF
CECILIA T. COVINGTON,
AN INCAPACITATED PERSON

----------

### FROM PROBATE COURT NO. 2 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1] ON REHEARING

----------

We have considered appellants Franklin E. Covington III's (Frank) and Lucila Covington's (Chila) motion for rehearing and motion for reconsideration en banc. We deny both the motions but withdraw our February 9, 2012 opinion and substitute the following.

---

[1]*See* Tex. R. App. P. 47.4.

In one issue, the Covingtons appeal the trial court's order denying their application for reinstatement as guardians of their incapacitated daughter, Cecilia T. Covington (Ceci). We affirm the trial court's judgment.

**Background Facts**

Ceci is a forty-year-old woman with Down Syndrome. Her parents, the Covingtons, sought and were granted guardianship of Ceci in 2003. In 2006, Ceci moved into a group home for disabled adults known as Sonnet. Sonnet is run by Champion Services.

In 2008, Champion employees became concerned that Ceci's mental health was deteriorating. Ceci complained of headaches during the night and would often stay awake screaming. Champion staff notified the Covingtons that Ceci was having problems such as "flat affect, not smiling, [and] aggression." In early 2009, Ceci began hiding screwdrivers in her room and laying marbles from a Chinese checkers game in a line at the bottom of the door to her room. One day, Ceci hit another group home resident because he was sitting in a van where Ceci wanted to sit. Ceci had imaginary friends that she spoke to, and Champion staff believed she was spending more and more time talking to them.

Worried that Ceci's behaviors were increasing in frequency and severity, Champion began requesting that the Covingtons consent to have Ceci evaluated by a psychiatrist. The Covingtons refused, believing that there was a "physical" source for Ceci's pain. Champion also discussed the screwdrivers and marbles with the Covingtons, who did not feel that they were a concern. The Covingtons

2

told Champion that Ceci's "booby-traps" were "only showing her frustration level at being bothered constantly" by Champion staff.

A meeting with Champion staff and the Covingtons was held on June 24, 2009. Champion employees gave the Covingtons an agenda for the meeting, listing their concerns about Ceci's health. The first topic listed was a request that the Covingtons consent to a psychiatric evaluation for Ceci. The Covingtons responded in a follow-up email, "Psychiatric evaluation will not be performed at this time." The second topic involved administration of medicines. One of the requests was that "[f]amilies cannot bring [over-the-counter] medications and supplements or pharmaceuticals into the [group home] without written doctor's orders." The Covingtons disagreed that they could not bring supplements into the home. Another request was that "[t]he nurse must be notified before administering any [over-the-counter] medicines and supplements." The Covingtons responded, "Guardians disagree, will not comply."

In July 2009, the trial court appointed a guardian ad litem for Ceci without notice to the Covingtons. The guardian ad litem then moved to have the Covingtons removed as Ceci's guardians without notice to them, claiming that they cruelly treated Ceci and neglected to maintain her as liberally as her means permitted. *See* Tex. Prob. Code Ann. § 761 (West Supp. 2011) (listing the grounds for which a guardian may be removed). Specifically, the guardian ad litem alleged that

3

1. The Ward herein evidences frequent and repeated aggressive emotional outbursts, and has been repeatedly observed talking to "imaginary" people. The recommendation of Group Home Staff was that the Ward receive a complete psychiatric evaluation. The Guardians both refused, without any expressed reason or valid justification. It appears that the Ward might benefit from such evaluation in better understanding whatever may truly be causing these behaviors.

2. The Ward has returned to the Group Home from several home visits with the Guardians and has repeatedly brought screwdrivers, as weapons, because of an imagined fear that someone is taking her belongings. When advised of this unacceptable behavior, the Guardians re-affirmed that they did not see any risk in this behavior [and] would continue to supply the Ward with such weapons.

3. Medication was prescribed for the Ward, namely [Z]oloft, and the Guardians discontinued and refused to allow the Ward to receive the prescribed medication, against medical advice, and without explanation or justification.

4. Guardians continue to self-diagnose the Ward's medical problems as "headaches" and continue to seek therapy and diagnosis to validate their own assessment, without any valid medical basis, and in contravention of the recommended course of evaluation and recommended medical treatment. As a result, the Ward continues to suffer and place others at risk with her increasingly violent outbursts.

5. The Guardians, in their own letter, stated that they refused to comply with the request that 'Nurse must be notified before administering [over-the-counter] medications and supplement[s]" Response "Guardians disagree, will not comply[.]"[] Further, the staff recommendation that "Families cannot bring supplements[,]"[] response "Guardians disagree[.]"[] The actions of the Guardians ignore the substantial side effects of many [over-the-counter] drugs and dietary supplements, some of which are so severe that the FDA has had to seek legislative intervention to stop distribution. Yet, the Guardians insist that they would be able to make those decisions without even communicating with the staff nurse.

After a hearing and without notice to the Covingtons, the trial court found that the Covingtons cruelly treated Ceci and neglected to maintain her as liberally as her means permit. The trial court also found that the Covingtons "have both been proven to be guilty of gross misconduct and gross mismanagement in the performance of their duties as Guardian" and ordered their removal without notice. It appointed Guardianship Services, Inc. as Ceci's new guardian.

The Covingtons then filed an application for reinstatement as guardians. After a hearing, the trial court found that the Covingtons failed to demonstrate by a preponderance of the evidence that they did not engage in the conduct that led to their removal and denied their application. This appealed followed.

## Standard of Review

In their motion for rehearing and their motion for reconsideration en banc, the Covingtons argue that we applied the wrong standard of review. They argue that their appeal was a no-evidence challenge. We first note that their issue on appeal read,

> Did Judge King abuse his discretion by denying the Covingtons' application for reinstatement as guardians of their daughter? Stated differently does the record reflect by a preponderance of the evidence that the Covingtons did not engage in the conduct that was alleged by the [guardian ad litem] for their removal?

The Covingtons also stated in their brief, "A guardianship determination is reviewed under an abuse-of-discretion standard." *See In re Guardianship of Finley*, 220 S.W.3d 608, 612 (Tex. App.—Texarkana 2007, no pet.); *Thedford v. White*, 37 S.W.3d 494, 496 (Tex. App.—Tyler 2000, no pet.).

5

We do note that neither of the two cases that the Covingtons cite (*Finley* and *Thedford*), although they are the only two cases that we have found referencing the reinstatement statute, *see* Tex. Prob. Code Ann. § 762 (West Supp. 2011), actually review the plaintiff's reinstatement claim under section 762. However, we believe the abuse of discretion standard applies here. The trial court's determination of reinstatement rests on whether it is satisfied by a preponderance of the evidence that the applicant did not engage in the conduct that directly led to the applicant's removal. *See* Act of May 30, 1993, 73rd Leg., R.S., ch. 957, § 1, 1993 Tex. Gen. Laws 4081, 4123 (amended 2011) (current version at Tex. Prob. Code Ann. § 762 (West Supp. 2011)).

The Covingtons argued in their brief on appeal that there was no evidence to support some of the trial court's findings, which we construed as a challenge to the legal sufficiency of the evidence.[2] *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999) (noting that a legal sufficiency challenge is an argument that (1) the record

---

[2]In fact, this section of the Covington's argument begins, "The Covingtons challenge the legal and factual sufficiency of the evidence to support the following findings of fact and the legal sufficiency of the evidence to support the following conclusions of law: 10a, 10b, 10c, 15, 32, 33, 36, 37, 38, 39, 40, and 41." The Covingtons then attempt to transform this appeal of the trial court's decision in the reinstatement hearing to an appeal of the removal itself by arguing that "[t]he removal of the Covingtons required clear and convincing evidence of their cruel treatment of Ceci. *See* Tex. Prob. Code Ann. § 761(b)." Whether the Covingtons were removed based on clear and convincing evidence was not at issue in the reinstatement hearing, nor is it now an issue before this court.

discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 361–62 (1960) ("The controlling consideration with an appellate court in passing on a point of error directed at the state of the evidence is not whether the point uses the preferable, or even the proper, terminology, but is whether the point is based upon and related to a particular procedural step in the trial and appellate process and is a proper predicate for the relief sought."). The abuse of discretion standard includes the legal and factually sufficiency of the evidence as "relevant factors in assessing whether the trial court abused its discretion." *Brooks v. Brooks*, 257 S.W.3d 418, 425 (Tex. App.—Fort Worth 2008, pet denied). Thus, a trial court abuses its discretion when there is no evidence to support its ruling. *D.N.S. v. Schattman*, 937 S.W.2d 151, 155 (Tex. App.—Fort Worth 1997, no writ) (citing *Loftin v. Martin*, 776 S.W.2d 145, 148 (Tex.1989)). For these reasons, we disagree with the Covingtons' premise that we applied the wrong standard of review.[3]

---

[3]To the extent that the Covingtons' motion for rehearing and motion for reconsideration en banc can be construed to request that we review the trial court's judgment under a different standard than that requested in their appeal, we cannot address their new issue. *See Wentworth v. Meyer*, 839 S.W.2d 766, 778 (Tex. 1992) (Cornyn, J., concurring) ("A motion for rehearing does not afford a litigant an opportunity to raise *new* issues, especially after the case has been

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620. An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

## Discussion

The Covingtons did not appeal the order removing them as guardians. Instead, they sought reinstatement under section 762 of the probate code. Section 762, as it read in 2009, stated,

> (a) Not later than the 10th day after the date the court signs the order of removal, a personal representative who is removed under Subsection (a)(6) or (7), Section 761, of this code may file an application with the court for a hearing to determine whether the personal representative should be reinstated.

---

briefed, argued, and decided on other grounds."); *Morrison v. Chan*, 699 S.W.2d 205, 206–07 (Tex. 1985) (holding that court of appeals did not err in refusing to reverse the case on a point raised for the first time in a motion for rehearing).

8

. . . .

> (c)   If, at the conclusion of a hearing under this section, the court is satisfied by a preponderance of the evidence that the applicant did not engage in the conduct that directly led to the applicant's removal, the court shall set aside an order appointing a successor representative, if any, and shall enter an order reinstating the applicant as personal representative of the ward or estate.

Act of May 30, 1993, 73rd Leg., R.S., ch. 957, § 1, 1993 Tex. Gen. Laws 4081, 4123 (amended 2011) (current version at Tex. Prob. Code Ann. § 762 (West Supp. 2011)).[4]   According to the plain language of the statute, the only issue in a reinstatement hearing is whether the former guardians "did not engage in the conduct that directly led to [their] removal."   Tex. Prob. Code Ann. § 762(c). Thus, because the Covingtons proceeded under section 762 instead of an appeal of their removal, we do not address whether it was error for the trial court to remove them under section 761(c)(4) without the statutorily required notice, *see id*. § 761(c) (requiring personal service of the guardian before removal under that subsection), or whether clear and convincing evidence was presented at the removal hearing that they cruelly treated Ceci, *see id*. § 761(b) (requiring proof

---

[4]Under the plain language of the statute, section 762 is only available when a guardian has been removed under either subsection (6) or (7) of section 761(a).  Tex. Prob. Code Ann. § 762(a).  Subsection (6) allows for the removal of a guardian who "has misapplied, embezzled, or removed from the state, or is about to misapply, embezzle, or remove from the state, all or any part of the property committed to the guardian's care."  *Id*. § 761(a)(6).  Subsection (7) in 2009 allowed for the removal of a guardian who "has neglected or cruelly treated a ward."  Act of May 30, 1993, 73rd Leg., R.S., ch. 957, § 1, 1993 Tex. Gen. Laws 4081, 4123 (amended 2011) (current version at Tex. Prob. Code Ann. § 761(a)(7) (West Supp. 2011)).   The Covingtons were removed under subsections (a)(7), (a)(8), and (c)(4).

by clear and convincing evidence for removal under subsection (a)(7)). The only question before us is whether the trial court abused its discretion in finding that the Covingtons did not prove by a preponderance of the evidence that they did not engage in the conduct that directly led to their removal as Ceci's guardians. *See id.* § 762(c).

The trial court's judgment states,

The conduct of the Applicants alleged and testified to in the removal hearing that directly led to the removal of the Applicants included:

a. Administration of over-the-counter medications and supplements to the Ward, and refusing to provide the Group Home with information regarding the medications and supplements;

b. Refusal to control the behavior of the Ward from repeatedly:

1. bringing screwdrivers to the Ward's room in the Group Home following visits to the home of the Applicants, despite repeated requests from the management of the Group Home to control such behavior;

2. setting "booby traps" in the Ward's room in the Group Home, despite clear statements on the part of the Ward that the intent of the "booby traps" was to "get rid" of a staff supervisor and despite repeated requests from the management of the Group Home to control such behavior;

c. Refusing to allow the Ward to be evaluated psychiatrically.

## I. The evidence presented

### A. Administration of over-the-counter medications

The Covingtons' expert witness, Dr. Susan Blue, testified that she did not find anything in the records she was given to review that documented that the Covingtons insisted that they would make decisions regarding over-the-counter medicines without communicating with Champion nurses or staff. However, the Covingtons' emailed response to the June 24th meeting with Champion stated that they disagreed with Champion's policy that the nurse must be notified before anyone administers over-the-counter medications or supplements and that they would not comply with the policy. Ceci's case manager, James Wallace, testified that their response was unacceptable and that the group home could not allow it.

There was testimony that Chila asked Champion staff to administer an unnamed medication to Ceci and when they refused because it had not been approved by the staff nurse, Chila administered it herself. There was also testimony that Chila had taken Ceci to receive some injections at a doctor's office outside the home without prior knowledge or approval of the Champion nurse. Chila then dropped Ceci off at the group home and told the staff that Ceci would have to be observed for four hours for side effects.

Angela Berry, the lead attendant at Champion, testified that in early 2009, Chila told her that Ceci had "become immune" to the Tylenol she was receiving, and that Chila wanted the staff to administer Motrin to Ceci instead. Berry testified, "she actually gave me a note that said, do not give Tylenol, and I was

11

supposed to share that note with my staff; but I had to get that approved through [the nurse]. I couldn't just pull the Tylenol and give her Motrin."

## B. Refusal to control Ceci's behavior

### 1. Screwdrivers

Chila admitted that Champion staff had reported to her that they had found screwdrivers in Ceci's room on more than one occasion, and that they had told her that it was inappropriate for Ceci to have them in her room. She said that Ceci "had her own screwdrivers" at the Covingtons' home. She acknowledged to Champion that the screwdrivers Ceci had at the group home came from the Covingtons' home and that Frank had bought new screwdrivers because the ones at the house kept disappearing. Dr. Blue opined that Ceci was not bringing the screwdrivers for "protection" because Ceci "operat[es] at a third grade level."

Berry testified that she personally removed four screwdrivers from Ceci's room, two from a jewelry box, one wedged in her closet, and one from behind a dresser. She said that when she informed Chila, Chila responded "like it was nothing to her." Berry testified that she was concerned for her safety because Ceci was "always angry" and had attacked a roommate and a staff member.

Wallace testified that Champion "asked them to make sure that she didn't bring screwdrivers in. And, you know, they just stated that it wasn't that big of a deal and we're blowing it out of proportion because that's all she was trying to do was protect herself." At the June 24th meeting, Champion again discussed the screwdrivers with the Covingtons. Frank responded by telling Champion that he

12

had a shotgun in his bedroom and saying, "Who doesn't want to protect themselves?" Chila testified that Frank does not have a shotgun in his bedroom, but that he was only "making a point." Wallace testified that he did not think the Covingtons' response was appropriate.

At the hearing, Chila continued to deny that Ceci's possession of screwdrivers posed a threat to others in the group home. She was asked,

Q. Right. So you've got a daughter who is talking to imaginary people, carrying on conversations with imaginary people, aggressively acted out beating—assaulting somebody in the front seat of the van because she didn't want—because she wanted to sit there, and now she's got screwdrivers by her bedside. You don't see a problem with that?

A. No, I do not.

Q. Okay.

A. I know my daughter.

Q. Do you see why the group home might be a little concerned about that?

A. I knew what their agenda was.

Q. What their agenda was? What was their agenda?

A. A psychiatric evaluation.

### 2. "Booby traps"

Chila acknowledged at the hearing that Champion had reported to her on more than one occasion that Ceci was arranging marbles in front of the door to her room at the group home. Chila claimed that Ceci only played with the marbles by putting them in lines. Champion staff testified that the marbles were

not a game but were specifically arranged "to trap you from opening the door or to get you." Ashley Woodard, a direct care staff at Champion, testified, "[W]hen I asked her to pick them up she says that it's a booby-trap and she needs them there. And she doesn't want to move them." Berry testified that Ceci would lay out the marbles very frequently, "too many [times] to count." Berry testified that Ceci would talk to her imaginary friend George and

> She would be very angry and upset and she would be talking to George about maybe plotting, like she would set booby-traps. That's what Ceci would call them, booby-traps. And the booby-traps she said was to get rid of myself and Adele, which is another staff.
>
> And at one point, she was in her room and she was telling George that the trap didn't work, like, ["]it didn't work. We got to try something else and we will try again tomorrow . . . .["]

Berry testified that Ceci told her, "You don't belong here, you got to go." She explained,

> She would take marbles and put them along her room door, like, right under the door, where if you were to look down, you're not going to see them until you open the door; and when we opened the door, we would see them there. And I notified her mother of it and she told me, well, the staff should be smart enough to look down on the ground or to just stay out of her room.

Wallace also testified that Ceci took "beads" and laid them in front of her door. He stated,

> And when one of the staff approached her door that—that she told them to come in and they saw the beads and they asked what they were for. And, I believe, she stated that come on in; you'll see. And then it was later discussed that she—she had them there so that the staff would trip and fall.

14

Dr. Blue testified that it would be a cause for concern if Ceci was setting booby traps, but in her opinion, Ceci did not have the mental capacity to create a booby trap. Dr. Blue testified that the notes she read from Champion stated that the staff laughed about the marbles.

Berry testified that she started to become concerned that Ceci was hiding screwdrivers and setting booby traps and "constantly planning to get rid" of staff members. Berry had all the knives in the group home locked up so that Ceci would not be able to access them. She explained that because the marbles came from a game, staff members were not allowed to take them from Ceci because she was allowed under her service program to have games.

Wallace testified that when the marbles were reported to the Covingtons, they did not think it was a serious concern. Denise Gasmire, the general manager and owner of Champion, also testified that the Covingtons were informed of the booby traps but that they "kind of laughed it off." The Covingtons told Champion that Ceci's "booby-traps" were "only showing her frustration level at being bothered constantly" by Champion staff.

## C. Refusing to allow Ceci to be evaluated psychiatrically

Gasmire testified that Ceci's behaviors were "getting very severe." She said,

> She would just be physically agitated, some yelling involved with that, just a lot of anger.
>
> We also documented some physical agitation when she would start saying, something is poking me. And then, self—like, injurious

15

behavior, she would hit herself a lot in these episodes and then she would talk to imaginary friends.  And I believe those were the four things that we specifically documented because they happened in clusters and one generally leads to the other, especially when she'd really get ramped up; so we were tracking those four behaviors specifically.

Berry testified that in the months prior to the Covingtons' removal, Ceci was talking to her imaginary friends more and more frequently.  She also testified that Ceci was more frequently getting angry at her roommates and staff members.  Wallace also testified that Ceci was acting out more and more frequently.  Gasmire testified that Ceci was unhappy and "suffering."

Chila testified that in the three months leading to her removal, she noticed that Ceci was "in a lot of pain."  She said that Ceci was "very consistent in having headaches at night.  We called them headaches because we didn't [k]now how to describe them, or she didn't know how to describe them; but she was in extreme pain."  Chila also admitted that Champion staff asked her and Frank "multiple times" on "multiple occasions" to get Ceci a psychiatric evaluation, but that she had never taken Ceci to a psychiatrist while she was her guardian.

The Covingtons did take Ceci to an allergist, an acupuncturist, a neurologist, a chiropractor, and had sinus surgery and sleep apnea treatments performed.  None of those alleviated Ceci's episodes.  The neurologist's only recommendation was that Ceci "use a special hypoallergenic pillow."  The Covingtons did take Ceci to a neuropsychologist, Dr. Bengston, but Champion staff told the Covingtons in the June 24th meeting that Dr. Bengston's report "did

16

not address any concerns or questions as to what may be the cause of the behaviors, or how to address the behaviors." The Covingtons "reported [that] the behaviors are due to the extreme pain and are mostly her coping mechanisms," and stated that the pain and resulting behaviors could be reduced by putting ice on Ceci's head, as recommended to them by the chiropractor. Chila told Champion that her neighbor had told her that if Ceci was evaluated by a psychiatrist, he will put her on medication. Chila admitted that Champion was only asking for an evaluation, not that Ceci be put on medication, but that she was refusing on the assumption that Ceci would be medicated anyway.

Two Champion employees at the meeting testified that the Covingtons' stated reason for refusing an evaluation was the fear that the psychiatrist would prescribe psychotropic medications. Chila testified that Champion asked the Covingtons at least ten times in the meeting to agree to a psychiatric evaluation. At the hearing, she was asked,

Q. Did you agree to do the psychiatric evaluation?

A. No.

Q. All right.

A. Not at that time.

The Covingtons told Champion that they did not want Ceci on medication until they found "the cause of their daughter's headaches and pain." They stated that they did not "recognize" Ceci's behaviors as "behavioral concerns but expressions of extreme pain and discomfort." They wrote in their annual report

17

to the probate court, "Cecilia's overall behaviors were to us, her parents/guardians, directly related to her sleep deprivation. [Champion] does not see this. They have been pushing for a neuropsychiatric and psychological evaluation since February [2008]." They also told the probate court that they believed that Ceci was actually improving. The Covingtons' expert witness, Dr. Blue, opined that the Covingtons did not inappropriately refuse a psychiatric evaluation. She testified that the Covingtons' concern that the psychiatrist would prescribe medication was a valid concern.

## II. Sufficiency of the evidence

The Covingtons did not prove by a preponderance of the evidence that they did not engage in the conduct that directly led to their removal as Ceci's guardians. *See* Tex. Prob. Code Ann. § 762(c). The preponderance of the evidence showed that the Covingtons refused to submit to a psychiatric evaluation on the assumption that Ceci would be medicated. The evidence also showed that Champion was seeking only an evaluation and not necessarily psychotropic medication; thus, the Covingtons' justification was not valid. The Covingtons also admitted to telling Champion that they refused to abide by Champion's policy of notifying the nurse before giving Ceci any over-the-counter medication or supplements.

The evidence also showed that the Covingtons did not express any concern over Ceci's possession of screwdrivers in the group home or her setting "booby traps" with marbles in front of her door. There was no evidence that the

18

Covingtons expressed any plan to limit Ceci's access to screwdrivers at their house or that they would cease buying screwdrivers to replace the ones Ceci took. The Covingtons maintained at trial that Ceci was not a threat to her roommates or Champion staff, despite acknowledging that Ceci would act out physically when she was upset or angry. Although the Covingtons' expert testified that because Ceci "operat[es] at a third grade level," she did not have the mental capacity to set the traps maliciously, the preponderance of the evidence was that Ceci was laying out the marbles "so that the staff would trip and fall."

In their motion for rehearing and their motion for reconsideration en banc, the Covingtons argue that our review of the evidence did not consider the evidence in its "proper context." They contend that the word "conduct" as used in the reinstatement statute equates to the grounds for removal under section 761. *See* Tex. Prob. Code Ann. § 761; Act of May 30, 1993, 73rd Leg., R.S., ch. 957, § 1, 1993 Tex. Gen. Laws 4081, 4123 (amended 2011) (current version at Tex. Prob. Code Ann. § 762 (West Supp. 2011)). In essence, they claim that we should review their behavior and determine whether those acts rise to the level of cruel treatment or gross misconduct and gross mismanagement in the performance of their duties as guardians. This amounts to a review of whether the guardian ad litem presented sufficient evidence to demonstrate that the Covingtons' conduct amounted to cruel treatment or gross misconduct at the hearing for removal. As we noted above, the Covingtons did not appeal their

19

removal, although a direct appeal of their removal was available. *See*, *e.g.*, *In re Keller*, 233 S.W.3d 454 (Tex. App.—Waco 2007, pet. denied) (appeal from a removal); *Finley*, 220 S.W.3d at 608 (same). Thus, we cannot review the trial court's judgment in the removal proceedings to remove the Covingtons.[5]

Even construing the word "conduct" in section 762 as the grounds listed in section 761, as the Covingtons would have us do, we cannot say that the trial court abused its discretion in finding that the Covingtons engaged in cruel treatment, gross misconduct, or gross mismanagement. Under the definition that the Covingtons set forth in their brief, cruel treatment includes "willful persistent infliction of unnecessary suffering, whether in realization or apprehension, whether of mind or body." *Goodfellow v. Goodfellow*, No. 03-01-00633-CV, 2002 WL 31769028, at *3 (Tex. App.—Austin, Dec. 12, 2002, no pet.) (not designated for publication). Gross misconduct or mismanagement includes "*at minimum*: (1) any *willful* omission to perform a legal duty; (2) any *intentional* commission of a wrongful act; and (3) any breach of a *fiduciary* duty that results in actual harm to a beneficiary's interest." *Finley*, 220 S.W.3d at 619 (quoting *Geeslin v. McElhenney*, 788 S.W.2d 683, 684–85 (Tex. App.—Austin 1990, no writ)).

The preponderance of the evidence showed that the Covingtons refused to submit Ceci to a psychiatric evaluation without valid justification, allowing Ceci's extremely painful headaches to continue. The Covingtons claim in their motion

---

[5]Even if we could review the removal, there is no record of the hearing for us to review.

for rehearing and their motion for reconsideration en banc that they based their refusal of the evaluation on the advice of Ceci's treating physicians and neuropsychologists. There was no evidence at the reinstatement hearing that any doctor told the Covingtons that a psychiatric evaluation was unnecessary or harmful. Chila only testified that none of the doctors told her to get a psychiatric evaluation. In fact, Chila's testimony was that they refused based on their neighbor's claim that Ceci would be medicated. Champion's requirement of notifying the nurse before giving Ceci any over-the-counter medication or supplements is an important policy implemented to protect Champion residents from dangerous medication interactions. The Covingtons expressly refused to abide by the policy, which could lead to serious physical danger, especially considering the number of doctors that Ceci sees and the number of medications that Ceci takes.

As the Covingtons note, section 762's purpose is to provide improperly removed guardians the opportunity to be reinstated by proving that they did not engage in the conduct that led to their removal. Under any definition of "conduct," the Covingtons failed to meet that burden. The preponderance of the evidence demonstrates that the Covingtons engaged in the conduct that directly led to their removal. Therefore, we cannot say that the trial court abused its discretion in denying the Covingtons' application for reinstatement. We overrule the Covingtons' issue.

## Conclusion

Having overruled the Covingtons' sole issue on appeal, we affirm the judgment of the trial court.

LEE GABRIEL
JUSTICE

PANEL:  GARDNER, MCCOY, and GABRIEL, JJ.

DELIVERED:  May 3, 2012