**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00206-CV**
_____

**CAROLDENE CAHILL, Appellant**

**V.**

**MARK CAHILL, Appellee**

On Appeal from the County Court at Law No. 2
Montgomery County, Texas
Trial Cause No. 18-11-14523-CV

**MEMORANDUM OPINION**

Appellant Caroldene Cahill appeals from a judgment awarding damages and attorney's fees to Appellee Mark Cahill and Intervenor Kenna Seiler for breach of fiduciary duties as Executrix of a Will. We affirm.

## Background

Aletha Wolf passed away on June 7, 2012. Aletha[1] was married to Allen Wolf, and she had two children: a daughter, Caroldene Cahill, and a son, Mark Cahill. Her Will stated that Caroldene should be appointed as Independent Executrix, and the court appointed her as executrix on June 12, 2012. The Will named the following beneficiaries and the share of the Estate they should receive: Caroldene 50%; Mark 25%; Alfred (Caroldene's son) 15%; Stephen (Mark's son) 5%; and Blain (Caroldene's grandson) 5%. The Will did not provide for a bequest to Allen[2] and stated that Aletha's estate "consists of my undivided interest in the community property of my husband and myself, as well as my separate property." Caroldene prepared an Inventory in March 2013, which valued the Estate at $1,128,883, and the court approved the Inventory.

In June 2015, Mark filed a motion to remove Caroldene as executrix, alleging that she had failed to distribute the Estate, she failed to respond to inquiries about the Estate, she admitted to making unauthorized payments of Estate funds, and she entered into a mediated settlement with Allen to convey real property in the Estate to Allen without requesting court approval or applying for an order of sale. In September 2016, the court appointed Aurelia Weems, C.P.A. to audit the Estate and

---

[1] We refer to the family members by first names.

[2] At trial, Caroldene testified that, at the time of Aletha's death, Aletha and Allen were in the process of divorcing.

produce a list of Estate assets. In May 2017, the court entered an order removing Caroldene as executrix and taxing all costs in the removal against her.

In October 2017, the court appointed Mark as Dependent Administrator of the Estate. Mark filed an Inventory that reported that the Estate was valued at $250,025.13 as of December 2017. In June 2018, Mark filed a Verified Petition to File Claims to Recover Estate Monies, alleging that Caroldene had overdistributed Estate assets to herself and her son Alfred. According to Mark, Weems estimated the value of the Estate at about $1,838,635.46. Mark also alleged that Weems's report reflected that $863,528 had been distributed from the Estate to Caroldene, her son Alfred, and her grandson Blain, and that no distributions of the Estate had been made to Mark or his son Stephen.

In November 2018, Mark filed an Original Petition against Caroldene and Alfred, stating claims for breach of fiduciary duty, money had and received, conversion, conspiracy, and civil theft. Mark also requested attorney's fees. Caroldene filed an Original Answer, asserting a general denial and affirmative defenses of laches and limitations. In a supplemental answer, Caroldene also asserted the affirmative defense of justification and that some actions she took were on the advice of counsel. Alfred filed an Original Answer, asserting a general denial and affirmative defense of limitations. The district court later transferred the case to County Court at Law No. 2.

In January 2020, Kenna Seiler filed a Motion for Substitution of Party and Attorney as Successor Dependent Administratrix of the Estate of Aletha Wolf. In it Seiler stated in October 2019, she was appointed as the Successor Dependent Administratrix, that she was "the correct party to this lawsuit[,]" and that Mark remained a plaintiff in his individual capacity. The court granted the motion.

In March and May 2020, Mark filed a First Amended Original Petition and two amended petitions, alleging that $275,903 of Estate assets were unaccounted for; stating claims for breach of fiduciary duty, conspiracy; and for declaratory relief, seeking a determination of the amount of the Estate that was payable to him. He also alleged that Caroldene embezzled $13,130 from the Estate; she distributed $863,528 to herself, Alfred, and Blain; and no distributions had been made to Mark or Stephen. Mark's First Amended Original Petition also alleged that the claims asserted in the Original Petition were owned by Kenna Seiler as Dependent Administrator, that he joined in those claims, and that Seiler had filed an intervention asserting those claims.

In March 2020, Seiler filed a petition in intervention against Caroldene and Alfred, stating claims for breach of fiduciary duty, conversion, civil theft, and conspiracy, and included a request for attorney's fees. An inventory attached to the petition listed the total value of the Estate as $250,208.33 and the value of claims against Caroldene owed to the Estate as $1,202,561. Seiler filed a First Amended

Petition in Intervention in June 2020, adding a claim for declaratory judgment "that Caroldene and Alfred violated the *in terrorem* clause contained in the Will by failing to distribute estate assets in accordance with the Will's terms, and as a result Caroldene and Alfred have forfeited their interests" in the Estate.[3] Caroldene filed an Original Answer to Petition in Intervention, asserting a general denial and the affirmative defenses of laches, limitations, justification, and that she acted on the advice of counsel. Alfred also filed an Original Answer to Petition in Intervention, asserting a general denial and asserting the affirmative defense of limitations.

Evidence at Trial

The claims were tried to the bench in July 2020.

<u>Testimony of Caroldene Cahill</u>

Caroldene agreed that in her March 2013 inventory, she listed the total value of the Estate as $1,128,883. Caroldene also agreed that, before being removed as executrix, she made distributions from the Estate to herself, to her son Alfred, and to her grandsons Blain and Stephen, including $65,000 to Alfred and $25,000 to

---

[3] At the same time, Seiler filed a Motion for Partial Summary Judgment, arguing that the Intervenor was entitled to a declaration that Caroldene had violated the Will's *in terrorem* clause. The motion alleged that shortly after Mark filed the Motion for Removal of Independent Executrix, Caroldene transferred $546,733.86—the entire amount of the Estate account—to herself, her son Alfred, and her grandson Blain. According to the motion, in her deposition Caroldene confirmed the transfers of $360,733.36 to herself, $65,000 to her son, and $25,000 to her grandson, but she denied knowing who received the remaining $161,000. The court denied the motion.

Blain. She testified that she bought a Mustang with Estate money that was intended as an investment and that "when it was all settled," the Mustang would be part of Alfred's distribution. She agreed that she made no distributions to Mark other than $10,000 for attorney's fees for a dispute with Aletha's husband Allen, but she testified that she set up a savings account to take care of any payment to him. She also agreed that she had written herself checks for $50,000, $161,000, and $360,000, but she testified that $25,000 of the $360,000 was transferred to Stephen's bank account.

Caroldene testified the mediated settlement agreement with Allen valued the marital estate at $1,851,721.73, and that she received $424,000 that went into the Estate even though she had said the Estate should have received $600,000. Caroldene also testified that some of her mother's accounts were payable-on-death ("POD") to her and did not belong to the Estate and that her original inventory of the Estate was "flawed."

According to Caroldene, her brother Mark filed a motion to remove her as executor because she "took too long[]" and because "he didn't get any distribution." Caroldene testified that her attorney sent Mark copies of everything and "everything was made available to him at the auditors." She stated that "[a]ll the files were at the auditors. He never even showed up." She also testified that she did not disagree with the findings by the court-appointed auditor Aurelia Weems. She agreed that, while

6

executrix, she paid herself some money and bought a home in Washington state and she did not distribute funds to the other beneficiaries because "Mark would not settle. He wanted more than he was entitled to." When asked how much of the Estate's assets she spent between September 2014 and May 2017, she responded "I'm not sure." Caroldene testified that when she was removed as executor and the accounts were taken over, the estate account had $250,000 in it. She also agreed that after she was removed as executrix, the Estate received $250,000 of the total of about $521,730 she transferred to herself.

Caroldene testified that, when Mark was appointed executor of the Estate, she did not deliver the Mustang to him because it was not "titled for the road." She also agreed that she listed the $30,000 for purchase of the Mustang as a cash disbursement to Alfred in her September 2014 inventory because "that was going to be for him, that would have [] gone towards his total." She agreed she transferred $360,730.11 in March 2016 and $161,000 in March 2018 from the Estate account to her personal savings account. She testified that when she took these amounts, she knew she was not finished with administering the Estate and paying beneficiaries, and she did not "[do] the math to reconcile" how much the Estate should distribute to her because she did not have all the expenses or a "final number to do any calculations." According to Caroldene, she gave information about the transfers to her attorney, and she understood that Mark "had the information" about those transfers. She also

testified that on the advice of her attorney, she was not to give Mark anything "until we were done." She agreed she should have left $250,000 in the Estate account.

Caroldene agreed that bank records reflected a charge of $8,179.27 in July 2012 to the Estate account for her travel and $30,000 in February 2013 for purchase of the Mustang. She could not recall what expenses she may have paid for that total of about $15,400. She agreed that she issued a $50,000 check to herself in July 2014 for expenses so she could relocate to Washington state and that it was part of the distribution from the Estate to herself, and she "had no reason" to issue checks to other beneficiaries at the same time. She also agreed there was a $10,000 payment to herself in December 2014 that was a POD account for her benefit and for her travel expense. Caroldene told the court that she had not given anyone proof of the POD accounts, but she stated she had copies of checks and statements.

Caroldene testified that she relied on the advice of counsel while she served as executor of the Estate. Caroldene also testified that the Estate paid several expenses totaling about $78,500, including: her mother's medical, utility, credit card, funeral, and tax expenses; filing fees for the estate; legal fees and mediation expenses; and travel expenses for herself, her son, and her grandson for her mother's burial.

Testimony of Mark Cahill

Mark testified that Caroldene did not keep him updated about the Estate, she did not send him spreadsheets or bank statements, and she did not pay any attorney's fees on his behalf from the Estate. He learned in August 2016 that Caroldene had made distributions to all the other beneficiaries, but she had made no distributions to him. According to Mark, he had no conversations with Caroldene about Allen's share of the estate or the settlement with Allen, and she did not tell him that Allen had taken too much money. Mark believed that the settlement agreement with Allen relied on inaccurate valuations.

Mark testified he had not received any distribution at the time of trial, but Caroldene had sent him some bonds on which he was the named beneficiary. Mark agreed that the 2014 inventory filed by Caroldene reflected a $30,000 disbursement to Alfred, but the inventory did not say that it was for the purchase of a Mustang.

Mark agreed that the inventory filed after he became Dependent Administrator reflected that there was $250,025.13 in the Estate. Mark also agreed within a week of his filing a motion to remove Caroldene as executor, Caroldene transferred money from the Estate account. A bank statement in evidence reflected that $646,733.36 was transferred from the Estate account to other accounts in March 2016 and the account had an ending balance of $0.00. According to Mark, after Caroldene was removed as Executrix, she did not offer to return the Mustang to him

or tell him where the Mustang was located. Mark did not believe it was fair that Caroldene made distributions to herself and others but not to him. Mark testified that at one point he added up what he considered the Estate's legitimate expenses, and they totaled $63,000, which did not include fees of $12,500 for the Estate's attorney or $3,000 for Aurelia Weems. Mark agreed that after he was appointed Dependent Administrator, he first deposited some of the $250,000 from the Estate into a personal account but later turned it back over to the Estate.

Many exhibits were admitted into evidence including: Aletha's Will; the Mediated Settlement Agreement with Allen; certain accountings prepared by Weems; and several bank account statements.

### Trial Court's Findings of Fact and Conclusions of Law

The trial court entered a Final Judgment ordering that Intervenor—Kenna Seiler as Successor Dependent Administrator of the Estate of Aletha Cahill-Wolf—and Mark have judgment for actual damages of $74,554.50 against Caroldene and that the Intervenor have judgment for $223,663.51 against Caroldene. The trial court found that Mark's share of the Estate was at least $243,613.66. The trial court ordered that Caroldene pay Mark $47,572.66 in attorney's fees.

10

Caroldene filed a Request for Findings of Fact and Conclusions of Law.[4] The trial court entered Findings of Fact and Conclusions of Law. We summarize the court's Findings of Fact below:

- Caroldene repeatedly contradicted herself and her testimony was not trustworthy.
- Weems's calculations were the best evidence of the value of the Estate provided at trial.
- After Caroldene filed an inventory in March 2013, certain items totaling about $3,900 "disappeared from the Inventory without explanation[,]" including a country club membership, computers, firearms, and air miles.
- After Caroldene filed an Annual Account in September 2014, two bank accounts totaling about $81,281 "disappeared from the Annual Account."
- As a result of the Mediated Settlement Agreement with Allen, the Estate was devalued by about $178,742 as compared with the original Inventory.[5]
- As a result of the settlement agreement with Allen, Caroldene appears to have benefitted personally and the Estate was damaged.
- Caroldene took a distribution for herself in August 2014. She made a distribution to her son in February 2013. Mark has never received a distribution. The remaining beneficiaries received distributions in March 2016.

---

[4] Caroldene requested findings of fact that she siphoned estate funds for her personal use, that she failed to make distributions in accordance with the Will, that she failed "to properly manage [Aletha]'s estate[,]" findings as to how she committed these offenses, how Mark's share of the Estate was $243,613.66, and that the Intervenor suffered damages of $74.554.50. She also requested conclusions of law regarding her breach of fiduciary duty, her liability for conversion, her liability for civil theft, that Caroldene and Alfred conspired to deprive the other beneficiaries of their share of the Estate, and that Mark and the Intervenor were entitled to declaratory judgment and attorney's fees.

[5] This included $141,246 in cash, $22,500 in home equity, and $14,966 in home contents.

11

- Caroldene included in the Inventory accounts she claimed were payable-on-death to her, but she failed to produce evidence of any payable-on-death account other than "her questionable testimony[.]"
- Caroldene claimed she reimbursed herself for $10,000 of her "bond money" that she deposited into the Estate bank account, but her explanation was "not logical[]" because at the time, the Estate bank account had more than $100,000 on deposit.
- Caroldene used $8,179.27 of Estate funds to pay for herself, her son, and another person to travel to Aletha's funeral.
- The Estate had expenses totaling $68,877.19 between August 2012 and November 2015. The court excluded a total of $103,426.27 in claimed expenses, including expenses that were unexplained, payments to Caroldene without explanation, a $10,000 payment to Caroldene that lacked evidence that it was a proper disbursement, disbursements of $50,000 and $30,000, and $8,179.27 in travel expenses to attend Aletha's funeral.
- The court was given three beginning balances for the Estate. The Inventory indicated $1,128,883.00. The Mediated Settlement Agreement indicated $925,850.86. And Weems stated the beginning value of the Estate was $919,952.70. Caroldene testified that she agreed with Weems's analysis. The trial court used Weems's value of the Estate in calculating damages because Mark asked for the minimum calculation and because the court regarded Weems's calculation as the "best evidence provided at trial[.]"
- The court calculated the Estate residuary as of April 2016 as $691.736.61.[6] The trial court stated that "[t]his represents the amounts that were present and accounted for by the Executor."
- Subtracting Estate expenses from Weems's value of the Estate, the court calculated the residuary Estate to be $243,613.66, using the value of the Estate that Weems calculated.
- The court determined that the damages to the Estate were $298,218.00,[7] and Mark's 25% share was $74,554.50.

---

[6] The Estate bank balance of $187,730.11 + the $424,003.23 settlement from Allen Wolf + $3.25 in interest earned + replacement of the $50,000 and $30,000 in distributions = $691,736.61.

[7] The ending Estate account balance per Weems was $989,954.62 - the calculated Estate residuary of $691.736.6 = $298,218.01.

12

The trial court concluded that Caroldene was an Executor and a beneficiary of the Estate, and the trial court made the following conclusions:

1. Executor is a fiduciary of the Estate and the beneficiaries of the Estate.
2. Executor breached her fiduciary duties by:
   a. Failing to properly and fully account for the disposition of all funds she administered for the Estate.
   b. Entering into a Settlement Agreement which gave up Estate claims and cured her own.
   c. Distributing funds to herself and her son years before distributing funds to any other beneficiary.
   d. Refusing to distribute funds to Mark Cahill.
   e. Removing Estate funds from the Estate account held at Chase Bank and placing them in a personal account of her own.
   f. Using Estate funds for travel for herself and others.
   g. Removing $10,615.00 cash from the Estate for herself.
   h. Mismanaging and misapplication of Estate funds.
3. Executor's actions proximately caused injury to Mark Cahill and the Estate and resulted in a benefit to Executor.
4. An approved Inventory creates a prima facie case that the property listed in the Inventory is property of the Estate.
5. Under Executor's management funds at a minimum in the amount of $298,218.01 have disappeared from the Estate, damaging the Estate and its beneficiaries including Mark Cahill.
6. Any further expenses the Estate has incurred after March 2016 date are due to the actions of the Executor in not distributing the Estate as required by the Will in lieu of secreting Estate funds in her personal account.
7. Plaintiff put on the testimony of Steven C. Earl and offered exhibit 21 which was admitted into evidence which supported Plaintiffs' attorneys' fees claim. Mr. Earl's testimony, in conjunction with the exhibit addressed each of the factors set forth in Tex. Disc. R. Prof'l Conduct 1.04(b) and Arthur Anderson & Co. v. Perry Equip. Corp., 945 S.W.2d 812 (Tex. 1997).
   a. The hourly rates are reasonable and customary in and around Montgomery County, Texas.

  b. The fees billed were reasonable and necessary given the unique features of this case.

8. In order for Plaintiff to have complete relief, he needed to seek declaratory relief. As reflected by the differing damage models, the Breach of Fiduciary Duty claim, while certainly related to the Declaratory Judgment claim, was not duplicative of it.

9. The Court finds the matters litigated herein are all intertwined, so as not to require segregation of fees. The Court finds that the reasonable, necessary, equitable and just attorney's fees for pursuit of Plaintiff's declaratory claims are $47,572.66 through this trial.

## Issues

In Appellant's first issue on appeal, she argues that the trial court did not have subject matter jurisdiction over Mark's cause of action under the Uniform Declaratory Judgment Act when he failed to join necessary parties. In her second issue, Appellant argues that the trial court erred in holding that Caroldene breached her fiduciary duties because the terms of the Will control, the Will allowed Caroldene to take the actions that form the basis of the trial court's conclusion that she breached her fiduciary duties, and the evidence is legally and factually insufficient to support the trial court's holding. In her third issue, Appellant argues that the trial court erred in granting attorneys' fees when the Declaratory Judgment Action was duplicative. In her fourth issue, Appellant contends that the statute of limitations bars Intervenor's suit in its entirety and partially bars Mark's suit as a matter of law. Appellant argues in her fifth issue that section 16.004, which provides for a four-year statute of limitations for a claim of breach of fiduciary duty, should

14

be interpreted as jurisdictional. And, in her sixth issue, she argues that the entire lawsuit is precluded by the doctrine of laches.

Standard of Review

The parties elected to try the case to the bench. Therefore, the trial court, as factfinder, was the sole judge of the credibility of the witnesses and weight of the evidence, and it was responsible for resolving conflicts in the evidence and drawing reasonable inferences from basic facts to ultimate facts. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-21 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004). The question on appeal is whether that evidence shows the trial court's verdict was reasonable. *City of Keller*, 168 S.W.3d. at 820.

When a trial court makes specific findings of fact and conclusions of law following a bench trial and a reporter's record is before the appellate court, the findings will be sustained if there is evidence to support them, and the appellate court will review the legal conclusions drawn from the facts found to determine their correctness. *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 789 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Findings of fact have the same force and dignity as a jury's verdict and are reviewable under the same standards of legal and factual sufficiency. *Foley v. Capital One Bank, N.A.*, 383 S.W.3d 644, 646 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "If the appellant does not challenge the trial court's findings of fact, when filed, these facts are binding upon both the party and

the appellate court." *IKB Indus. v. Pro-Line Corp.*, 938 S.W.2d 440, 445 (Tex. 1997) (citing *Wade v. Anderson*, 602 S.W.2d 347, 349 (Tex. App.—Beaumont 1980, writ ref'd n.r.e.)).

In a legal sufficiency challenge, we credit evidence that favors the finding, if a reasonable factfinder could, and we disregard evidence contrary to the challenged finding unless a reasonable factfinder could not disregard it. *See City of Keller*, 168 S.W.3d at 827. When a party challenges the legal sufficiency of the evidence on an issue for which it did not have the burden of proof, the appellant must demonstrate there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). In reviewing a no-evidence challenge, we view the evidence in the light most favorable to the verdict. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex. 1992). We cannot sustain a legal insufficiency, or no evidence point, unless the record shows:

> (1) …a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.

*Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (citations omitted).

In a factual-sufficiency review, we examine all the evidence, and we will set aside the judgment only if it is so contrary to the overwhelming weight of the

16

evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). Unlike a legal-sufficiency review, a factual-sufficiency review requires us to review the evidence in a neutral light. *See id.*

Preservation of Error

A party asserting an affirmative defense in a bench trial must request findings in support of that defense to avoid waiver on appeal. *Sears, Roebuck & Co. v. Nichols*, 819 S.W.2d 900, 907 (Tex. App.–Houston [14th Dist.] 1991, writ denied). When the trial court makes findings that do not establish any element of a defense, the party relying upon that defense must file a request for additional findings to avoid waiver of that defense on appeal. *Id.*; *see also Trelltex, Inc.*, 494 S.W.3d at 785; *Intec Sys., Inc. v. Lowrey*, 230 S.W.3d 913, 919 (Tex. App.—Dallas 2007, no pet.).

Appellant did not request a finding of fact or conclusion of law on the affirmative defenses of statute of limitations, estoppel, justification, or laches. After the trial court issued its findings of fact and conclusions of law, Appellant did not file a request for additional findings of fact and conclusions of law. We conclude, therefore, that Appellant has waived any error related to her affirmative defenses of limitations, estoppel, justification, and laches. *See Cooper v. Cochran*, 288 S.W.3d 522, 531 (Tex. App.—Dallas 2009, no pet.) (op. on reh'g). We overrule Appellant's fourth and sixth issues, and we do not consider Appellant's arguments of estoppel or justification as to issue three.

17

Appellant's first issue argues that the trial court lacked subject-matter jurisdiction over Mark's claim for declaratory relief because he failed to join the necessary parties. According to Appellant, Mark asked for a declaratory judgment on the amount of the residuary estate, but he failed to serve Stephen Cahill and Blain Clague, who were parties with interests in the residuary estate. Appellant argues that the declaratory judgment Mark sought affected Stephen and Blain's interests, they were necessary parties to the action, and failure to serve them deprived the trial court of subject-matter jurisdiction to enter the declaratory judgment, citing to *In re Estate of Bean*, 120 S.W.3d 914, 921-22 (Tex. App.—Texarkana 2003, pet. denied).

The record does not reflect that Caroldene timely raised this point in the trial court. Generally, the failure to join a party for just adjudication should be raised by a verified plea in abatement. *See* Tex. R. Civ. P. 93(4); *Jones v. LaFargue*, 758 S.W.2d 320, 324 (Tex. App.—Houston [14th Dist.] 1988, writ denied)). The Texas Supreme Court has stated that by failing to raise the issue of joinder of parties in the trial court, a party waives the issue for appeal. *See Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163 (Tex. 2004).

The Uniform Declaratory Judgments Act ("UDJA") permits a person with interests under a will to seek a declaration of his rights under the will. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.004(a), 37.005(3). "When declaratory relief is

sought, all persons who have or claim any interest that would be affected by the declaration must be made parties. A declaration does not prejudice the rights of a person not a party to the proceeding." *Id*. § 37.006(a). A trial court has discretion to determine joinder of parties, and the UDJA does not supersede that discretion. *See Bean*, 120 S.W.3d at 920 (citing Tex. R. Civ. P. 39; *MCZ, Inc. v. Smith*, 707 S.W.2d 672, 675 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.)). Although joinder of all persons with an interest that would be affected by a declaratory judgment is mandatory under the UDJA, noncompliance with this provision "does not uniformly constitute a jurisdictional defect." *See id.* (citing *Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385, 389 (Tex. 1977)).

Appellant waived this alleged defect by failing to raise the issue in the trial court. We also note that, by the time of trial, Caroldene had made distributions to herself, to her son Alfred, and to her grandson Blain. Appellant also failed to explain how nonjoinder of either Blain or Stephen prejudiced them. The alleged nonjoinder is not a jurisdictional defect. *See Brooks*, 141 S.W.3d at 163 (explaining that any nonjoined parties would be entitled to pursue their claims in separate lawsuits); *Barnett v. Havard*, No. 09-12-00310-CV, 2014 Tex. App. LEXIS 6435, at *6 n.1 (Tex. App.—Beaumont June 12, 2014, no pet.) (mem. op.); *Stark v. Benckenstein*, 156 S.W.3d 112, 118 (Tex. App.—Beaumont 2004, pet. denied) (stating that a trial

19

court's declarations do not prejudice the rights of nonparties). We overrule Appellant's first issue.

Breach of Fiduciary Duty

In her second issue, Appellant argues that the trial court erred in holding that she breached her fiduciary duties, and she argues that this erroneous conclusion probably caused the rendition of an improper judgment. According to Appellant, the terms of the Will control, and the Will allowed Caroldene to take the actions that were the basis for the trial court concluding she breached her fiduciary duties. Appellant generally alleges that Article VII of the Will, titled "Fiduciary Provisions[,]" gives the executor "broad authority with respect to estate property." Appellant argues that Article VII of the Will expressly allowed her to enter into any transaction on behalf of the estate to exchange or sell estate property on the terms and conditions she deemed proper, so that entering into a settlement agreement giving up estate claims was not improper nor a breach of fiduciary duty. She also argues that the Will allowed her to make "in her discretion, any distribution permitted to any beneficiary directly," including a partial distribution. Appellant also argues that she had a reasonable basis for delaying distribution to Mark—they disagreed as to the amount to which he was entitled, a final accounting was never made, and expenses were adding up—and a good faith disagreement "does not

equate to mismanaging and misapplication of estate funds." According to Appellant, the trial court's Findings of Fact and Conclusions of Law lack evidentiary support.

As a general rule, an executor of an estate owes a fiduciary duty to the beneficiaries of the estate arising from the executor's status as trustee of the estate's property. *See Humane Soc'y of Austin & Travis Cty. v. Austin Nat'l Bank*, 531 S.W.2d 574, 577 (Tex. 1975); *Sklar v. Sklar*, 598 S.W.3d 810, 820 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (citing *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996); *FCLT Loans, L.P. v. Estate of Bracher*, 93 S.W.3d 469, 480 (Tex. App.—Houston [14th Dist.] 2002, no pet.)). As a fiduciary, an executor has a duty to protect the beneficiaries' interest by fair dealing in scrupulous good faith with fidelity and integrity. *Humane Soc'y of Austin & Travis Cty.*, 531 S.W.2d at 580; *In re Roy*, 249 S.W.3d 592, 596 (Tex. App.—Waco 2008, pet. denied) (citing *Geeslin v. McElhenney*, 788 S.W.2d 683, 685 (Tex. App.—Austin 1990, no writ)). The executor must take care of the estate property as a prudent person would take care of the person's own property. *See* Tex. Estates Code Ann. § 351.101. An executor may not promote her own personal interests to the injury of the heirs or contrary to the purposes of the administration of the estate. *See In re Roy*, 249 S.W.3d at 596-97. The executor's fiduciary duty also requires full and fair disclosure to the beneficiaries of all material facts that might affect their interests. *See id.* at 597; *see also Punts v. Wilson*, 137 S.W.3d 889, 891 (Tex. App.—Texarkana 2004, no pet.).

21

A fiduciary owes a "'high duty of good faith, fair dealing, honest performance, and strict accountability.'" *Punts*, 137 S.W.3d at 892 (quoting *Ludlow v. DeBerry*, 959 S.W.2d 265, 279 (Tex. App.—Houston [14th Dist.] 1997, no writ)).

> A fiduciary "has an affirmative duty to make a full and accurate confession of all his fiduciary activities, transactions, profits, and mistakes." [] Additionally, when a plaintiff alleges self-dealing by the fiduciary as part of a breach-of-fiduciary-duty claim, a presumption of unfairness automatically arises, which the fiduciary bears the burden to rebut.

*Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App.—Houston [14th Dist.] 2011, pet. denied.) (citations omitted). A fiduciary also owes a duty to make payments only to the persons entitled to receive them. *See Holder-McDonald v. Chicago Title Ins. Co.*, 188 S.W.3d 244, 248 (Tex. App.—Dallas 2006, pet. denied) (citing *Bell v. Safeco Title Ins. Co.*, 380 S.W.2d 157, 161 (Tex. App.—Dallas 1992, writ denied).

As we have already noted, Appellant failed to preserve error for appeal on her affirmative defenses of justification and estoppel by failing to request findings of fact or conclusions of law on those issues. Based on the record before us, we conclude that the trial court's determination that Caroldene breached her fiduciary duty as executor of the Estate was supported by the evidence. By her own testimony, Caroldene could not recall the purpose of several withdrawals from the Estate bank account. She agreed that she made distributions to herself, her son Alfred, and her grandsons Blain and Stephen, but not to Mark. Weems's accounting determined that Caroldene used Estate funds for trip expenses, and Caroldene's 2014 Annual

22

Account reported $8,179.47 in disbursements for "Arlington Trip for Funeral." Caroldene also testified that she paid herself $50,000 for her personal expenses to relocate to Washington state. Weems's accounting also reflected that, after the settlement agreement with Allen, $185,681 was missing from Estate assets as compared with the 2013 Inventory. Caroldene agreed she bought a vehicle for $30,000, she intended the purchase to be an investment that would "bring a lot of money," but that there was no valid title to the vehicle. She also agreed that the vehicle was in storage at the time of trial, and she had not turned the property over to Mark or the Intervenor after she was removed as Executrix. Mark testified that about a week after he filed his motion to remove Caroldene as executrix in February 2016, Caroldene transferred money from the Estate account, and a bank statement in evidence reflected that $646,733.36 was transferred from the Estate account to other accounts in March 2016 and the account had an ending balance of $0.00.

On this record, we agree with the trial court. The evidence reflects that Caroldene did not deal fairly with the other beneficiaries under the Will, she did not disclose all material facts to the other beneficiaries, she promoted her own interests, and she did not act with fidelity and integrity. *See Humane Soc'y of Austin & Travis Cty.*, 531 S.W.2d at 580; *In re Roy*, 249 S.W.3d at 596-97. We conclude the evidence was legally and factually sufficient to support the trial court's conclusion that Caroldene breached her fiduciary duties, and the judgment is not so contrary to the

weight of the evidence as to be clearly wrong and unjust. *See City of Keller*, 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176. We overrule Appellant's second issue.

Attorney's Fees

In Appellant's third issue, she argues that the trial court erred in awarding attorney's fees because she contends the declaratory judgment was duplicative and the relief sought under the UDJA was no greater than the relief sought in a previous Temporary Injunction Order or in the claim for breach of fiduciary duty.

When a party has a claim for which fees are unavailable in addition to a claim for declaratory relief, the declaratory relief claim must do more than merely duplicate the issues being litigated by the claims for which fees are unavailable. *See Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 268 (Tex. 2021). "It is an abuse of discretion to award attorney's fees under the UDJA when the relief sought is no greater than relief that otherwise exists by agreement or statute." *Strayhorn v. Raytheon E-Systems, Inc.*, 101 S.W.3d 558, 572 (Tex. App.—Austin 2003, pet. denied); *see also Allstate Ins. Co.*, 627 S.W.3d at 270 (award of attorney's fees under UDJA is reviewable for abuse of discretion).

According to Appellant, the attorney's fees award should be reversed because the declaratory judgment action was duplicative. She relies on *Texas State Board of Plumbing Examiners v. Associated Plumbing-Heating-Cooling Contractors of Texas, Inc.*, 31 S.W.3d 750 (Tex. App.—Austin 2000, pet. dism'd by agr.). In that

24

case, the petitioners challenged the validity of an administrative rule under the Administrative Procedure Act ("APA"), which did not authorize an award of attorney's fees, and sought relief under the UDJA, and the Texas Constitution. *See id.* at 751-53. The Austin Court of Appeals stated that "to award attorney's fees under the UDJA when the statute is relied upon solely as a vehicle to recover attorney's fees[]" was an abuse of discretion. *See id.* at 753. The Austin Court determined that the trial court found it was "central" to construe certain rules for continuing education for plumbers in determining the validity of the administrative rule under the APA. *See id.* at 754. The Austin Court concluded that the scope of the lawsuit "went beyond merely challenging an administrative rule[]" and there was no abuse of discretion in awarding attorney's fees. *Id.*

In this case, the trial court determined that "[i]n order for Plaintiff to have complete relief, he needed to seek declaratory relief[,]" and while the questions were related, they were not duplicative. In other words, Mark's claim for a declaration of the minimum share distributable to him "went beyond" a determination of damages to the Estate resulting from Caroldene's breach of fiduciary duty. *See id.* Mark argues that his prior lawsuit sought only to remove Caroldene as executrix; his claim for breach of fiduciary duty was an award of 25% of the assets of the Estate; and the relief sought in his claim for declaratory relief was a determination of the minimum share distributable to him. Mark contends that the claim for declaratory relief

25

"picked up where the breach of duty claim left off[]" and "required a complete review of the Estate's assets, liabilities and transactions." The trial court reasonably could have concluded based on the record that the declaratory judgment action was necessary and was not duplicative. We cannot say the trial court abused its discretion in concluding the claims were not duplicative and awarding attorney's fees. *See id.* We overrule Appellant's third issue.

Whether Section 16.004 Is Jurisdictional

In her fifth issue, Appellant argues that the trial court lacked subject-matter jurisdiction to hear the Intervenor's case and most of Mark's case because section 16.004 of the Civil Practice and Remedies Code is jurisdictional. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004 (providing that the statute of limitations for a suit for breach of fiduciary duty is four years.). The Texas Supreme Court has explained that the statute of limitations is an affirmative defense, and it is not jurisdictional. *See In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 308 (Tex. 2010) (citing Tex. R. Civ. P. 94; *Day v. McDonough*, 547 U.S. 198, 205 (2006) ("A statute of limitations defense…is not 'jurisdictional[.]'"); *see also Uddin v. Cunningham*, No. 01-18-00002-CV, 2019 Tex. App. LEXIS 7963, at **13-16 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, pet. dism'd) (mem. op.) (concluding that the four-year statute of limitations imposed by section 16.004 is an affirmative defense and is not jurisdictional). We have stated that "[w]hen a statute does not require dismissal for

26

failure to comply, this points to a finding that it is not jurisdictional." *See Hocevar v. Molecular Health, Inc.*, 593 S.W.3d 764, 770-71 (Tex. App.—Beaumont 2019, no pet.) (concluding that section 21.111 of the Labor Code was not jurisdictional because it did not have a specific consequence for noncompliance). Appellant's position is not supported by the law, and we overrule her fifth issue.

Having overruled all of Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on November 30, 2021
Opinion Delivered February 3, 2022

Before Golemon, C.J., Kreger and Johnson, JJ.